308 Ga. 218
FINAL COPY

S19A1496. HYDEN v. THE STATE.

Melton, Chief Justice.

Following a March 29 to 31, 2004 jury trial, Clark Milton Hyden was found guilty of malice murder, felony murder, kidnapping with bodily injury, and various other offenses in connection with the beating death of Tommy Crabb, Sr.[1] On appeal, Hyden contends that the evidence presented at trial was insufficient to support his kidnapping conviction under the standard set forth in

___

[1] On February 10, 2003, Hyden was indicted for malice murder, felony murder predicated on kidnapping with bodily injury, felony murder predicated on aggravated battery, kidnapping with bodily injury, aggravated battery, and aggravated assault. Following his March 2004 trial, Hyden was found guilty on all counts. He was sentenced to life in prison for malice murder and a consecutive life term for kidnapping with bodily injury. The aggravated battery and aggravated assault charges were merged into the malice murder count for sentencing purposes. The trial court also purported to merge the two felony murder counts into the malice murder count, but those counts were actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993). Hyden filed a motion for new trial on May 13, 2004, which he amended through new counsel on March 7, 2019. Following a March 8, 2019 hearing, the trial court denied the motion on April 26, 2019. Hyden filed a timely notice of appeal on May 6, 2019, and his appeal was docketed to the August 2019 term of this Court and submitted for a decision on the briefs.

*Garza v. State*, 284 Ga. 696 (670 SE2d 73) (2008); that the trial court erred by allowing the State to waive its initial closing argument; that Hyden was denied his right to a speedy appeal; and that Hyden's trial counsel was ineffective. For the reasons that follow, we affirm.

1. Although Hyden challenges the sufficiency of the evidence only with regard to his kidnapping with bodily injury conviction, we review the sufficiency of the evidence to support all of his convictions, consistent with our customary practice in murder cases. See, e.g., *Walker v. State*, 306 Ga. 579 (1) (832 SE2d 420) (2019).

When evaluating the sufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." (Citation and emphasis omitted.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). On appeal, "this Court does not re-weigh the evidence or resolve conflicts in testimony, but instead defers to the jury's assessment of the weight

and credibility of the evidence." (Citation omitted.) *Curinton v. State*, 283 Ga. 226, 228 (657 SE2d 824) (2008).

Viewed in the light most favorable to the verdict, the evidence presented at trial reveals that, on November 6, 2002, Crabb, an electrician, went to Hyden's home to teach Hyden how to fix a kitchen light. Crabb knew Hyden because Hyden had helped Crabb with odd jobs in the past. Crabb's wife became worried when Crabb did not come home for lunch that day as he normally would, and she and her children began to drive around looking for him.

A family friend named Danny Fulcher and Fulcher's stepdaughter began looking for Crabb as well, and they went to Hyden's mobile home to see if Crabb might be there. Although Fulcher and his stepdaughter had driven by the mobile home several times on November 6 and seen lights on in the mobile home, Hyden's truck parked outside, and movement inside the mobile home, no one answered when Fulcher and his stepdaughter stopped and knocked on the door during the day. They returned to Hyden's mobile home around 1:00 a.m. and saw Hyden sitting on his front porch. They

3

spoke with Hyden, and he informed them that somebody had hit him over the head when he and Crabb had been working on an electrical outlet, and that he did not know where Crabb was because Hyden had been unconscious since lunch time the previous day. Fulcher's stepdaughter called 911, but paramedics who responded did not find evidence of any wound that they believed could have rendered Hyden unconscious for 12 hours.

Later that morning, Crabb's daughter and Fulcher's stepdaughter continued to search for Crabb, and they knocked on the door of a mobile home behind Hyden's. As they were leaving, they saw Crabb's truck, which was parked between Hyden's mobile home and the mobile home of one of his neighbors. Crabb's daughter went to the truck, where she discovered her father's dead body, covered by a spare tire, lying in the bed of the truck. Crabb's daughter called 911, and police arrived at the scene soon thereafter. Hyden came out of his mobile home after police arrived at the scene and said, "Oh damn there is [Crabb]."

Police went into Hyden's mobile home and noticed the

4

unusually clean nature of Hyden's kitchen in relation to the remainder of his residence. Luminol spray revealed the presence of blood on the kitchen floor. A forensic biologist later matched swabbings taken from the floor with Crabb's DNA. Police also found a wadded-up paper towel with suspected blood on it and more suspected blood between Hyden's clothes dryer and the pantry wall, as well as in an adjacent closet. In addition, police discovered a bloody rubber mallet that had been discarded in a county dumpster, and the blood from the mallet was later identified as matching Crabb's. In the area between Hyden's house and Crabb's truck where Crabb's body was found, police also found a cinder block with Crabb's blood on it. Crabb's wallet and keychain were located behind his pick-up truck, and luminol spray revealed a "drag trail" of blood between Hyden's home and the truck. Crabb had numerous blunt force injuries to the top of his head, and the State's medical examiner testified that Crabb died from blunt force trauma consistent with having been hit with a rubber mallet.

Hyden was arrested at the scene, and, after signing a waiver of

rights form, he was interviewed by police that same day. In his interview, Hyden claimed that Crabb had come to his house to help him with a broken light on the morning of November 6, and that a man with a long black stick and a gun came in through Hyden's back door and knocked Hyden unconscious. Hyden claimed that, when he woke up, Crabb and Crabb's truck were gone. When questioned about the presence of blood in his home, Hyden changed his story, claiming that he saw the man with the stick beat Crabb, that blood was everywhere, and that the man asked Hyden to help him clean up. So Hyden retrieved a blanket and rags and cleaned up the scene, and he placed Crabb on the blanket and dragged him across the house. Hyden asserted that the man made him drag Crabb out of the mobile home while Crabb was still alive and gasping for air. Also, contrary to his original story in which he said he had been knocked unconscious, Hyden said the man then handcuffed him to the front door while he moved Crabb's truck to the neighbor's house. Hyden claimed that he let the man leave the scene after the man removed Hyden's handcuffs, and that Hyden then drove around,

threw some trash in a dumpster, and returned home and drank beer until he passed out.

Later that month, while in custody in the Franklin County Jail, Hyden admitted to another inmate that he had killed Crabb by beating him to death with a rubber mallet during a dispute over money. He also admitted to dragging Crabb out of his mobile home, putting Crabb in a truck, and parking the truck next door to his mobile home. Hyden also admitted to another inmate that he beat Crabb to death with a hammer and that he put Crabb in a truck and threw a spare tire on top of him, but Hyden also said that he intended to push the truck into a lake but "never got around to it."

The evidence was sufficient for a rational trier of fact to find Hyden guilty of malice murder beyond a reasonable doubt. Hyden admitted to beating Crabb to death with a rubber mallet and placing his body in the truck where it was found, and there was an abundance of physical evidence at Hyden's home that connected him to the crime. See, e.g., *Velasco v. State*, 306 Ga. 888, 891 (1) (b) (834 SE2d 21) (2019) (evidence was "easily sufficient" to sustain murder

7

conviction where defendant admitted to beating the victim with hammer and where crime scene blood evidence and victim's injuries were consistent with brutal beating and dragging). The jury was free to reject Hyden's shifting stories about someone else killing Crabb while Hyden either watched or was incapacitated. See *Bailey v. State,* 291 Ga. 144, 147 (1) (728 SE2d 214) (2012) (jury is "free to reject a version of events favorable to" the defendant, as articulated by the defendant, and find him guilty of murder based on the other evidence presented at trial).

Hyden contends with regard to his conviction for kidnapping with bodily injury that the evidence was insufficient because the State failed to prove the asportation element of kidnapping required under *Garza.* Specifically, he argues that, because Crabb was either already dead at the time that he was moved, or because the movement that occurred was merely incidental to the other crimes that he committed, Hyden could not be found guilty of kidnapping with bodily injury under the legal standard that was applicable at the time of his trial.

The asportation standard applicable to Hyden's 2004 kidnapping with bodily injury conviction was articulated in *Garza*, supra, 284 Ga. at 702 (1). Although the standard set forth in *Garza* has since been superseded by statute (see *Gonzalez v. Hart*, 297 Ga. 670 (777 SE2d 456) (2015)), it was the standard applicable at the time of Hyden's 2004 conviction.

> With respect to the asportation element of kidnapping,
>
> *Garza* ultimately held that . . . the movement necessary to establish asportation must be more than "merely incidental" to other criminal activity, and four judicially created factors must be considered before a court can conclude that more than "merely incidental" movement had occurred.

(Citation omitted.) *Sellars v. Evans*, 293 Ga. 346, n. 1 (745 SE2d 643) (2013). The four factors are:

> (1) the duration of the movement; (2) whether the movement occurred during the commission of a separate offense; (3) whether such movement was an inherent part of that separate offense; and (4) whether the movement itself presented a significant danger to the victim independent of the danger posed by the separate offense.

(Citation omitted.) *Garza*, supra, 284 Ga. at 702 (1). Generally, the satisfaction of all four factors is not required in order for the

9

evidence to support a proper finding of asportation under *Garza*. See

*Hammond v. State*, 289 Ga. 142 (2) (710 SE2d 124) (2011) (finding

that the movement of the victim constituted asportation when the

first two factors were not satisfied but the third and fourth were);

*Brown v. State*, 288 Ga. 902 (3) (708 SE2d 294) (2011) (asportation

found where three of four *Garza* factors met).

While it is unclear from the record exactly how far Hyden

moved Crabb, it is clear that Hyden dragged Crabb out of the mobile

home and to a truck that was ultimately moved and parked between

his mobile home and his neighbor's home; the movement occurred

*after* the beating that led to Crabb's death had already taken place

(but while evidence indicates he was still alive); and the movement

itself further endangered Crabb by isolating him from a place where

he could have been more easily found. See, e.g., *Inman v. State*, 294

Ga. 650 (1) (b) (755 SE2d 752) (2014); *Williams v. State*, 291 Ga. 501

(1) (b) (732 SE2d 47) (2012); *Chatman v. Brown*, 291 Ga. 785 (1) (733

SE2d 712) (2012). There was evidence from which the jury could

conclude that Crabb was still alive at the time that he was moved,

10

because, in one of the stories that Hyden told the police, he admitted that Crabb was still alive and gasping for air when Hyden moved him from the mobile home.

The evidence was sufficient to sustain Hyden's conviction for kidnapping with bodily injury under *Garza*. See *Williams*, supra, 291 Ga. at 504 (1) (b).

2. Hyden argues that the trial court erred by allowing the State to waive its initial closing argument and present its entire argument after Hyden's closing in violation of former OCGA § 17-8-71 ("After the evidence is closed on both sides, the prosecuting attorney *shall* open and conclude the argument to the jury.") (emphasis supplied).[2] However, as Hyden concedes, this Court has already rejected this exact argument in prior cases. See *Bradham v. State*, 243 Ga. 638, 639 (2) (256 SE2d 331) (1979) ("After the close of evidence, the trial court, in its discretion, may permit the party having the opening and concluding argument to waive the opening statement and make a

---

[2] The portion of OCGA § 17-8-71 quoted above remains unchanged in the current version of the statute.

11

full presentation regarding the legal and factual facets of his case to the jury following the final argument of the adverse party."). See also *Petty v. State*, 283 Ga. 268 (3) (658 SE2d 599) (2008); *Lewis v. State*, 283 Ga. 191 (3) (657 SE2d 854) (2008). Hyden asks us to reconsider these precedents, but we see no compelling reason to do so. And under the precedents, there was no error.

3. Hyden contends that his constitutional right to a speedy appeal was violated due to the 15-year delay between the filing of his motion for new trial and its resolution.[3]

"[S]ubstantial delays experienced during the criminal

---

[3] With regard to the nearly 15-year delay between Hyden's trial and the hearing on his motion for new trial, trial counsel testified at the motion for new trial hearing that, after filing Hyden's new trial motion and submitting his bill for services to the trial court, he discussed with the trial judge the possibility of ineffective assistance of counsel becoming an issue on appeal. The trial judge then suggested that it might be appropriate for new counsel to be appointed. At that point, trial counsel stopped working on Hyden's case. The trial judge later died, and trial counsel did not follow up to see if the court had ever appointed a new attorney for Hyden. Nor did trial counsel inform Hyden that a new lawyer would be handling his case. Trial counsel only realized in 2018 that the case had never been reassigned, when, as part of the preparing of the now-required lists of all outstanding motions for new trial for each circuit, the trial court discovered that the motion for new trial had not been ruled upon. See Uniform Superior Court Rule 39.3.1. See also *Owens v. State*, 286 Ga. 821, 826 (2) (693 SE2d 490) (2010).

appellate process implicate due process rights." *Chatman v. Mancill*, 280 Ga. 253, 256 (2) (a) (626 SE2d 102) (2006). And, speedy appeal claims are assessed by balancing the same four factors applicable to speedy trial claims as articulated in *Barker v. Wingo*, 407 U. S. 514 (92 SCt 2182, 33 LE2d 101) (1972). See *Chatman*, supra, 280 Ga. at 257 (2) (a). These factors include "[1] [the] length of [the] delay, [2] the reason for the delay, [3] the defendant's assertion of his right, and [4] [the resulting] prejudice to the defendant." (Punctuation omitted.) Id. at 256 (2) (a) (quoting *Barker*, supra, 407 U. S. at 530). In evaluating a trial court's decision to deny a speedy appeal claim, "we must accept the factual findings of the trial court unless they are clearly erroneous, and we must accept the ultimate conclusion of the trial court unless it amounts to an abuse of discretion." (Citation and punctuation omitted.) *De La Cruz v. State*, 303 Ga. 24, 30 (6) (810 SE2d 84) (2018).

(a) *Length of the Delay*. "The length of delay that will provoke a constitutional inquiry is necessarily dependent upon the peculiar circumstances of the case." (Citation and punctuation omitted.)

*Chatman*, supra, 280 Ga. at 257 (2) (b). However, here, as the State correctly concedes, the 15-year delay between Hyden's conviction and the trial court's ruling on his motion for new trial was significant and weighs in Hyden's favor. See *Loadholt v. State*, 286 Ga. 402, 406 (4) (687 SE2d 824) (2010) (nine-year delay was excessive); *Chatman*, supra, 280 Ga. at 257 (2) (b) (eight-year delay was excessive). See also, e.g., *Veal v. State*, 301 Ga. 161 (3) (800 SE2d 325) (2017) (assuming that 18-year delay between filing of motion for new trial and ruling on the motion was excessive).

(b) *Reason for the Delay*. Although strategic delays by the State are weighted heavily against the State, "[a] . . . neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker*, supra, 407 U. S. at 531 (IV).  See also *De La Cruz*, supra, 303 Ga. at 30-31 (6) (ii).

The delay in this case stems from reasons including negligence rather than from an intentional or strategic delay caused by the

14

State. Indeed, after trial counsel filed a timely motion for new trial and stopped working on the case under the belief that the trial court would be appointing new appellate counsel, the trial judge died before new counsel was appointed. Nevertheless, the failure of the trial court to timely appoint appellate counsel and to effectively manage its docket weighs in favor of Hyden. See *Owens v. State*, supra, 286 Ga. 821, 826 (2) (b) n.4 (693 SE2d 490) (2010) ("[T]he State bears the ultimate responsibility for the efficient management of court dockets.") (disapproved in part on other grounds by *Shelton v. Lee*, 299 Ga. 350 (2) (b) n.7 (788 SE2d 369) (2016)). See also *Ruffin v. State*, 284 Ga. 52, 61 (2) (b) (ii) (663 SE2d 189) (2008) (for speedy trial purposes, the "State" includes all state actors, even trial and appellate court judges). However, because the reasons for the delay are neutral, they are "weighted less heavily." *Barker*, supra, 470 U. S. at 531 (IV).

(c) *Defendant's Assertion of His Right to Appeal*. Even though Hyden testified at the motion for new trial hearing that he wrote to his trial counsel three times in the years after his conviction, his

15

counsel testified that he never received any letters or phone calls from Hyden. The trial court was entitled to credit counsel's testimony over Hyden's. See *Watkins v. State*, 285 Ga. 355, 357 (1) (676 SE2d 196) (2009) ("[I]t is the function of the trial court at the hearing on the motion for new trial to determine witness credibility and to resolve any conflicts in the testimony.") (citation and punctuation omitted). Moreover, Hyden conceded that he had never contacted the trial court to inquire about his pending motion during the entire 15-year timeframe between his conviction and the filing of his amended motion for new trial. In light of the limited efforts by Hyden to raise any issue about an appeal for nearly 15 years, it cannot be said that he clearly asserted his right to appeal. See *Owens*, supra, 286 Ga. at 826 (2) (c) (factor weighed against appellant where, despite reporting multiple attempts to contact counsel, appellant did not specify when efforts were made or why he did not contact the trial court for 20 years to seek resolution of his claims). Accordingly, this factor weighs heavily against Hyden. See *Barker*, supra, 407 U.S. at 531-532 (IV) ("The strength of

16

[appellant's] efforts will be affected by the length of the delay [among other things] . . . . The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy [appeal] right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.").

(d) *Prejudice to Defendant*.

> [T]he prejudice necessary to establish a due process violation based on post-conviction direct appeal delay is prejudice to the ability of the defendant to assert his arguments on appeal and, should it be established that the appeal was prejudiced, whether the delay prejudiced the defendant's defenses in the event of retrial or resentencing.

(Footnote omitted.) *Chatman*, supra, 280 Ga. at 260 (2) (e). "[A]ppellate delay is prejudicial when there is a reasonable probability that, but for the delay, the result of the appeal would have been different." (Citation and punctuation omitted.) Id. at 260-261 (2) (e). "In determining whether an appellate delay violates due process, prejudice, unlike in the speedy trial context, is not presumed but must be shown." (Citation and punctuation omitted.) *Veal*, supra, 301 Ga. at 168 (3). See also, e.g., *Norman v. State*, 303

Ga. 635, 642 (5) (814 SE2d 401) (2018) ("[W]here prejudice is clearly lacking, we will not reverse a conviction, even if the other factors favor the defendant."); *Veal*, supra, 301 Ga. at 168 (3) ("[W]e have repeatedly found that the failure to make this showing [of prejudice] in an appellate delay claim [is] fatal to the claim, even when the other three factors weigh in the appellant's favor.").

The record reveals that Hyden has not made the requisite showing of prejudice. Specifically, Hyden claims he suffered prejudice because, during the pendency of his motion for new trial, the original trial judge died, and his motion with respect to the general grounds had to be considered by a newly assigned judge. However, "after a thorough review of the case, even a successor judge may exercise a significant discretion to grant a new trial on the general grounds." *White v. State*, 293 Ga. 523, 525 (2) n.4 (753 SE2d 115) (2013). The newly assigned judge considered Hyden's claims on the general grounds and rejected them after "having considered all relevant matter presented to or made known to [the] Court." Furthermore, Hyden's "implicit argument that the first

18

judge may have disagreed with the successor judge's denial of [his] motion for new trial on the general grounds is wholly speculative." *Veal*, supra, 301 Ga. at 168 (3). Under these circumstances, prejudice has not been shown.

Hyden also claims that, during the delay, the court reporter lost the original recording of his custodial interview, which deprived him of the opportunity of having the new judge hear the interview before deciding the issues raised in his motion for new trial.[4] However, despite the loss of the recording, the court reporter did produce a transcript of the interview. Hyden does not explain how hearing the interview (as opposed to reading it) would have changed the trial court's ruling, and generalized speculation that consideration of the recording would have somehow resulted in a different outcome is insufficient to show prejudice. See *Lord v. State*, 304 Ga. 532 (8) (820 SE2d 16) (2018); *Payne v. State*, 289 Ga. 691 (2)

---

[4] Hyden raised the issue of the voluntariness of his custodial statement in his original motion for new trial.

19

(b) (715 SE2d 104) (2011).[5]

Finally, Hyden contends that the delay was prejudicial because he was "completely without counsel" for 15 years. However, an absence of counsel alone does not equate to prejudice. Indeed, where, as here, "we have found no merit to the other enumerations raised herein," Hyden cannot show prejudice. *Owens*, supra, 286 Ga. at 826-827 (2) (d). See also *Loadholt*, supra, 286 Ga. at 406 (4). This is so because "[t]here can be no prejudice in delaying a meritless appeal." (Citation and punctuation omitted.) Id. Because we have concluded that Hyden's other enumerations of error are meritless, he has failed to establish a "reasonable probability that, but for the delay, the result of [his] appeal would have been different." (Citation and punctuation omitted.) *Chatman*, supra, 280 Ga. at 260-261 (2) (e). Accordingly, we affirm the trial court's denial of Hyden's speedy appeal claim.

4. Finally, Hyden asserts a cursory argument that he received ineffective assistance of trial counsel (see *Strickland v. Washington*,

---

[5] Hyden does not dispute the transcript's accuracy.

466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984)), claiming only that his trial counsel may have been ineffective "if the foregoing errors [asserted in this appeal] were not preserved" below. However, as Hyden himself concedes, trial counsel did properly preserve his argument relating to the State's waiver of its initial closing argument by making a timely objection below. Furthermore, even if trial counsel had not objected, a claim of ineffective assistance would have still been meritless, as trial counsel's objection would have been futile in light of controlling precedent allowing the State to waive its initial closing argument. See, e.g., *Bradham*, supra, 243 Ga. at 639 (2). See also *Anglin v. State*, 302 Ga. 333, 343 (8) (806 SE2d 573) (2017) ("The failure to pursue a futile objection does not amount to ineffective assistance.") (citation and punctuation omitted). Moreover, this Court traditionally has not required enumerations relating to the sufficiency of the evidence to be preserved through trial court objections, and, in any event, the evidence presented at trial was sufficient to support Hyden's convictions. See Division 1, supra. Finally, the issue regarding the

right to a speedy *appeal* has nothing to do with any objection that needed to be made at *trial* in order to be preserved. And, that claim, too, is without merit. See Division 3, supra. Hyden has shown no basis for a viable claim of ineffective assistance of trial counsel in this case.

*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 28, 2020 --- RECONSIDERATION DENIED MARCH 13, 2020.
Murder. Franklin Superior Court. Before Judge Malcom.

*Howard W. Anderson III*, for appellant.

*D. Parks White, District Attorney, Meredith M. Head, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth H. Brock, Assistant Attorney General*, for appellee.