NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: February 6, 2024

S23A0810.  HARPER v. THE STATE.

MCMILLIAN, Justice.

On August 27, 2003, a jury found Terry Harper, along with his co-defendant Emmanuel Ruiz, guilty of murder and related charges in connection with the shooting deaths of Joe Luhrman, David Carty, and Tracy Glover in 2001.[1] On appeal, Harper contends that

---

[1] The crimes were committed on September 26, 2001. Harper and his co-defendant Emmanuel Ruiz were indicted by a Fulton County grand jury on October 30, 2001. The indictment charged Harper and Ruiz jointly with three counts each of malice murder; felony murder while in the commission of an aggravated assault; and aggravated assault with a deadly weapon; as well as one count each of possession of a weapon during the commission of a felony. Harper and Ruiz were tried in a jury trial commencing August 20, 2003, and both co-defendants were found guilty as charged on August 27, 2003. Harper and Ruiz each were sentenced on August 29, 2003, to three consecutive terms of life imprisonment for malice murder plus five consecutive years in prison on the weapons offense. The felony murder counts were vacated by operation of law, and the aggravated assault counts were merged for purposes of sentencing. Ruiz's convictions are not part of this appeal.

Harper filed a timely motion for new trial on September 5, 2003, and the motion was amended three times by later appellate counsel. Following a hearing on November 7 and 10, 2022, the trial court denied the amended

(1) his right to due process was violated by the "almost 20-year delay" between his conviction and his direct appeal; (2) the trial court abused its discretion in denying his motion for mistrial after the State referenced, in its opening statement, a response  Harper gave to police questioning that Harper contends was previously excluded and "highly prejudicial"; and (3) he was denied effective assistance of counsel when his trial attorneys failed to obtain and introduce evidence that he was suffering a  "severe injury" to his dominant hand at the time of the shootings. We affirm for the reasons set forth below.

We recounted many of the facts in this case in our opinion affirming the conviction of Harper's co-defendant, Ruiz, as follows:

> Viewed in a light most favorable to the verdict, the evidence established that Ruiz had been paid $2,500 by Joe Lurhman, the proprietor of F.J.'s Tavern, to procure drugs. Ruiz, however, failed to deliver the drugs and on the afternoon of the shooting, Lurhman made several phone calls to Ruiz attempting to collect his money. That evening, Ruiz told a friend that he intended to go to F.J.'s

---

motion for new trial on November 30, 2022. Harper's timely appeal was docketed to the August 2023 term of this Court and submitted for a decision on the briefs.

Tavern to kill Lurhman and everyone else in the bar. Ruiz and co-defendant Terry Brandon Harper entered F.J.'s Tavern where Harper shot and killed Lurhman and bar patron David Carty. Ruiz fatally shot bartender Tracy Glover in the parking lot as she ran from the building after shots had been fired in the bar. Ruiz and Harper returned to Ruiz's apartment where they solicited help from a friend to dispose of the two murder weapons in nearby lakes. These were later retrieved by the police and identified as belonging to Ruiz.

Later on the night of the shooting, Ruiz telephoned his girlfriend and told her, "somebody went up to F.J.'s Tavern and took everyone out." He admitted to her that he shot a woman in the parking lot because she could have been a witness to the other shootings. Harper told others that he shot Lurhman and another man who happened to be in the bar. Each victim died of multiple gunshot wounds.

At trial, Ruiz acknowledged through his attorneys that he shot and killed Glover as she ran through the parking lot, but he claimed that he "panicked" and shot her in self-defense.

*Ruiz v. State*, 286 Ga. 146, 147 (686 SE2d 253) (2009).

In addition to the facts recounted in the *Ruiz* opinion, the evidence at trial showed the following. The friend whose help Harper and Ruiz solicited to dispose of the guns testified at trial that on the evening the murders took place, he drove Harper to Ruiz's

3

apartment at around 8:00 or 8:30 p.m. The friend said that he, Ruiz, and Harper drank alcoholic beverages and took Xanax. The friend recalled that Ruiz and Harper left the apartment at around 9:00 p.m. after Ruiz received a phone call, while the friend stayed behind and fell asleep. He was awakened sometime around 11:00 to 11:30 p.m. when Ruiz and Harper returned, stating that they needed "to get rid of a couple of guns." The friend drove Harper to two nearby lakes where Harper threw out two guns, one gun into each lake, and then the friend drove Harper home. The friend recognized the guns because Ruiz had shown them to him before.

Ruiz's girlfriend testified that when she got to Ruiz's apartment on the night of the shooting, the friend was there and she heard him tell Ruiz that he had dropped Harper at home and "they got rid of some guns." The friend later led investigators to the locations where Harper had thrown the guns, and police recovered the weapons. Ruiz's girlfriend testified that the day after the shooting, Ruiz told her that he and Harper went to F. J.'s Tavern earlier on January 26, and Luhrman got mad at Harper, threatening

4

that he would "go to Stockbridge to find" Harper. She also overheard Harper telling others that he walked into the tavern later that day and said to Luhrman, "Now come to Stockbridge and find me, motherf\*\*\*er." Harper said he then shot Luhrman and Carty, who was standing there at the time.

1. Harper first contends that the over-19-year delay between his conviction and his direct appeal violated his right to due process under the Fourteenth Amendment of the United States Constitution. We review Harper's claim that his delayed appeal constituted a due process violation under the four-part balancing test set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (IV) (92 SCt 2182, 33 LE2d 101) (1972). See *Hyden v. State*, 308 Ga. 218, 223 (839 SE2d 506) (2020) ("[S]peedy appeal claims are assessed by balancing the same four factors applicable to speedy trial claims as articulated in *Barker v. Wingo*."); *Chatman v. Mancill*, 280 Ga. 253, 256-57 (2) (a) (626 SE2d 102) (2006) (adopting the four-factor test for speedy-trial claims set forth in *Barker* for claims asserting violation of due process for lack of a timely appeal). Under that test, "the court must

examine the length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Morris v. State*, 308 Ga. 520, 525 (2) (842 SE2d 45) (2020) (citation and punctuation omitted). However, in a speedy appeal claim, unlike a speedy trial claim, the failure to show actual prejudice from the delay is "fatal to the claim, even when the other three factors weigh in the appellant's favor." *Veal v. State*, 301 Ga. 161, 168 (3) (800 SE2d 325) (2017), overruled in part on other grounds in *Johnson v. State*, 315 Ga. 876, 889 (3) n.11 (885 SE2d 725) (2023). See also *Leslie v. State*, 292 Ga. 368, 373 (7) (738 SE2d 42) (2013); *Whitaker v. State*, 291 Ga. 139, 143-44 (3) (728 SE2d 209) (2012). "In evaluating a trial court's decision to deny a speedy appeal claim, we must accept the factual findings of the trial court unless they are clearly erroneous, and we must accept the ultimate conclusion of the trial court unless it amounts to an abuse of discretion." *Hyden*, 308 Ga. at 224 (3) (citation and punctuation omitted).

The record shows that Harper was sentenced on August 29, 2003, and afterward, Harper's first appointed appellate counsel,

6

who was also one of his trial attorneys, filed a timely motion for new trial on September 5, 2003. After filing that motion, Harper's first appellate counsel took no further action in his case and failed to communicate with Harper or his family when they reached out to him. It was not until July 10, 2014, after Harper began petitioning the trial court, pro se, for assistance in pursuing an appeal, that he was appointed a second appellate counsel, who filed an amended motion for new trial on November 23, 2015. A month later, however, on December 22, 2015, Harper filed a pro se motion asking that his second appellate counsel be removed and that his case be "stayed," and on March 31, 2016, Harper's second appellate counsel filed a motion to withdraw. At an April 15, 2016, hearing on that motion, the second appellate counsel informed the trial court that Harper had initiated a bar complaint seeking to have her disbarred.[2]

No further court action occurred in the case until December

---

[2] The second appellate counsel informed the trial court in 2021 that the bar complaint was dismissed.

15, 2020, when a new judge who was assigned to Harper's case[3] scheduled a status conference for January 5, 2021. During that conference, the second appellate counsel appeared for Harper and asked the court to grant her still-pending motion to withdraw.[4] On February 4, 2021, the trial court granted the second appellate counsel's withdrawal motion and appointed Harper a third appellate counsel. After filing two motions for continuance to allow time to prepare a second amended motion for new trial, the third appellate counsel filed the second amended motion on October 6, 2021. Before a hearing could be held on the amended motion, however, Harper's third appellate counsel was appointed to be a judge, and he withdrew from Harper's representation.

Harper's third appellate counsel was replaced by Harper's

---

[3] The original trial judge's last action of record in Harper's case occurred when he held the hearing on the motion to withdraw in April 2016. The record reflects that the matter subsequently was assigned to a new judge, who recused herself on May 2, 2017, due to her "substantive involvement, during prior employment," in Harper's case. It is unclear from the record when Harper's case was assigned to the third judge.

[4] At the same hearing, Harper told the court that he had never asked for the second appellate counsel to be appointed in the first place, asserting that the court reporter took it upon herself to make the request on his behalf, yet he also stated that he never had the desire to represent himself.

current appellate counsel, who, after obtaining a continuance, filed a third amended motion for new trial on September 29, 2022. The trial court denied Harper's motion for new trial, as amended, on November 30, 2022, approximately nineteen years and three months after the first motion had been filed.

In denying the speedy appeal claim, the trial court considered the *Barker v. Wingo* factors. As for the first factor—the length of delay—the court found that the delay in the decision on the motion for new trial was lengthy and thus that the first factor weighed in Harper's favor.

In addressing the reason for the delay under the second factor, the trial court divided the delay period into two parts: (1) the first twelve years, from September 5, 2003, when the original motion for new trial was filed, to the day the first amended motion for new trial was filed in November 2015; and (2) the last seven years, from November 18, 2015, when Harper decided that he did not want to be represented by his second appellate counsel, to November 30, 2022,

9

the date of the order denying the motion for new trial.[5] The trial

court weighed the first period of delay in Harper's favor and against

the State but weighed the second delay period against Harper, based

on his decision to reject his appointed counsel and ask for a stay,

which resulted in multiple requests for continuances.

The trial court weighed the third factor—the assertion of the

right—in Harper's favor after finding that Harper never ceased to

assert his right to appeal, by writing letters to his counsel and

petitioning the clerk of the superior court for assistance in pursuing

his appeal.

In addressing the fourth factor, however, the trial court found

that Harper failed to show actual prejudice from the delay. Harper

---

[5] We note that the trial court's order misstates the date the first amended motion for new trial was filed by six days. It was filed on November 23, 2015, not November 17, 2015, as the order states. The trial court also determined that Harper decided on November 18, 2015, that he no longer wanted to be represented by his second appellate counsel, but the first evidence of Harper's decision in that regard that we could locate in the record appears in his Motion to Remove Counsel and Stay Proceedings filed on December 22, 2015. Nevertheless, we conclude that these errors do not change our analysis in this case because, unlike in a speedy trial claim, Harper's failure to establish prejudice is fatal to his speedy appeal claim, regardless of how the other *Barker v. Wingo* factors are weighed. See *Veal*, 301 Ga. at 168.

testified at the motion hearing that he is right-handed and that "[r]oughly a week" before the shootings, he broke his right hand in multiple places in a motorcycle accident. He said that his hand was stabilized in a "half-cast" that went halfway around his arm from the tips of his fingers to his elbow, except for his thumb. The "half-cast" was designed to allow "some flexibility and mobility to move [his] arm but not use [his] arm." Harper said he was still wearing the cast at the time of his arrest. However, his left hand was un-casted. Harper also presented evidence that the medical records no longer existed because the treating hospital had purged them after ten years pursuant to "state medical record retention requirements." Harper testified that he told one of his trial attorneys about his accident and the subsequent treatment of his arm.

The trial court found that the medical records were not material and would not have changed the outcome of his trial. The trial court further found that the court record showed that Harper's trial attorneys were aware of Harper's medical condition but chose not to pursue a defense based on that condition. Instead, they

asserted that Harper was not even present at the crime scene. Specifically, at trial, counsel elicited testimony from Harper's friend that Harper's hand was broken and his arm was in a brace[6] on the night of the shooting and that Harper had difficulty moving that arm. Harper's counsel relied on this testimony in his closing argument to support the defense that Harper was not present during the crimes, arguing that with his injuries, Harper would not have been "the kind of guy you would want to bring to a fight," and that Harper could not have been the man whom witnesses saw run from the bar that night and drive away because every time Harper moved his arm, it hurt. The trial court found that the medical records would not have aided that defense.

On appeal, Harper takes no issue with the trial court's findings under the first and third factors of the *Barker v. Wingo* test. As to the second factor, Harper does not contest that the trial court

---

[6] Harper provided no evidence to show how the "half cast" he described at the motion hearing differed from a "brace" or was not encompassed by that term.

properly weighed the first twelve years of delay against the State, but he argues that the court erred in weighing the final seven years against him and not the State. However, we need not address Harper's arguments relating to the third factor because even if we assume that the trial court should have weighed all nineteen years and three months of delay against the State, as Harper argues, we agree with the trial court that Harper's failure to show actual prejudice under the fourth factor is fatal to his claim that the delay in his appeal resulted in a due process violation.

"In determining whether an appellate delay violates due process, prejudice, unlike in the speedy trial context, is not presumed but must be shown." *Veal*, 301 Ga. at 168 (3) (citation and punctuation omitted). And in a case involving appellate delay, "where prejudice is clearly lacking, we will not reverse a conviction, even if the other factors favor the defendant." *Norman v. State*, 303 Ga. 635, 642 (5) (814 SE2d 401) (2018). See *Veal*, 301 Ga. at 168 (3). Moreover, this Court has determined that

the prejudice necessary to establish a due process

violation based on post-conviction direct appeal delay is prejudice to the ability of the defendant to assert his arguments on appeal and, should it be established that the appeal was prejudiced, whether the delay prejudiced the defendant's defenses in the event of retrial or resentencing.

*Chatman*, 280 Ga. at 260 (2) (e). Moreover, "appellate delay is prejudicial when there is a reasonable probability that, but for the delay, the result of the appeal would have been different." Id. at 260-61 (2) (e) (citation and punctuation omitted).

Harper argued below, and on appeal, that the appellate delay prejudiced his ability to pursue a claim of ineffective assistance based on his counsel's failure to introduce medical records showing injuries to his hand at the time of the shootings because the medical records are no longer available.[7] He further asserts that the

---

[7] Harper asserted claims of ineffective assistance of counsel based on his trial attorneys' failure to obtain and use the medical records at trial, as well as their failure to ask for certain jury instructions. In addition to his claim of prejudice resulting from the lack of the medical records, Harper also asserts on appeal that because both of his trial attorneys were deceased by the time of the motion hearing, the delay prejudiced his ability to pursue his ineffectiveness claims because he could not question his counsel about their decisions at trial. He raised this argument at the hearing on the motion for new trial in connection with the ineffectiveness claim concerning the medical records, but he did not raise the claim with regard to the claims addressing the

14

unavailability of the records would prejudice his ability to mount a defense based on his injuries if he were to receive a new trial.

To establish that his trial counsel provided ineffective assistance, Harper has the burden of satisfying both prongs of the test set out in *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984).

> First, [Harper] must show counsel's performance was deficient by showing counsel made errors so serious that he was not functioning as the counsel guaranteed to him by the Sixth Amendment. [In doing so, Harper] must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable

---

jury instructions.

Because Harper failed to assert such a claim of prejudice in the trial court regarding his attorneys' failure to request the jury instructions, we need not address the inability to question trial counsel about the jury instructions as evidence of prejudice on appeal. See, generally, *Johnson v. State*, 300 Ga. 459, 461 (2) (796 SE2d 272) (2017) (claims asserted for the first time on appeal "are waived and need not be considered by this Court"). And we are unpersuaded by Harper's claim of prejudice on this ground in connection with his ineffectiveness claim based on the medical records. In addressing Harper's ineffectiveness claim on that ground in Division 3 below, we assume for purposes of analysis that Harper's attorneys were deficient in failing to obtain and to introduce the medical records, yet we nevertheless conclude that the claim is meritless because Harper failed to show prejudice under *Strickland*, 466 U. S. at 687 (III). Thus, the absence of Harper's trial counsel's testimony concerning the medical records did not prejudice his ability to pursue that claim.

professional conduct.[8] Second, [Harper] must show the deficient performance prejudiced the defense, which requires showing that counsel's errors were so serious that they likely affected the outcome of the trial.

*Kilpatrick v. State*, 308 Ga. 194, 201 (7) (839 SE2d 551) (2020) (citation and punctuation omitted).

Although the over-19-year delay in Harper's appeal was extraordinarily long and troubling, we agree with the trial court that Harper has failed to establish that it resulted in a violation of due process because he did not show a reasonable probability that he would have prevailed on his ineffective assistance of counsel claim if the delay had not resulted in the destruction of his medical records.

Harper's trial attorneys were aware of his injury, and they elicited testimony that his injury and the treatment affected his

---

[8] Here, although both of Harper's trial attorneys were deceased by the time of the motion hearing, "[e]ven where . . . trial counsel is no longer available to testify regarding the manner in which he conducted appellant's defense at trial, appellant must still overcome [the] presumption" that counsel's trial decisions were in the reasonable range of professional conduct. *Green v. State*, 302 Ga. 816, 819 (2) (b) n.3 (809 SE2d 738) (2018) (citation and punctuation omitted); *Jones v. State*, 296 Ga. 561, 564 (2) (769 SE2d 307) (2015) (citation and punctuation omitted).

right arm's mobility. They then used that evidence to support a defense, not based solely on that injury, but rather on the absence of any physical or other direct evidence showing that Harper had anything to do with the crimes or that he was even present at the time of the shootings.[9] Harper's counsel argued during his closing that Harper's injuries made it unlikely that he would have been solicited to participate in the crimes or that he could have been the man witnesses saw drive away from the scene.

Moreover, the evidence Harper's attorneys presented at trial showed that Harper may have been hampered in firing the gun used to shoot Luhrman and Carty, given his injury and the brace. But Harper presented no evidence to support an inference that the medical records could have shown anything beyond that. Harper presented no evidence – not even evidence showing how the gun was fired – to suggest that Harper would have been unable to operate the weapon, when he had an uninjured left arm and hand and the

[9] Defense counsel expressly informed the trial court that this was their chosen defense strategy at an ex parte bench conference during the trial.

half-cast allowed some movement in his right arm and thumb.

Therefore, even assuming that Harper's trial attorneys were deficient for failing to obtain[10] and introduce the medical records at trial, Harper did not show that the records could have supported a defense that he was incapable of firing the gun or successfully bolstered his trial counsel's defense strategy at trial. Accordingly, he cannot show that if he had the medical records, he would have met the prejudice prong under *Strickland* and prevailed on his claim of ineffectiveness of counsel. See *Stepp-McCommons v. State*, 309 Ga. 400, 409  (4) (b) (845 SE2d 643) (2020) (ineffectiveness claim fails where defendant failed to show that the evidence trial counsel failed to obtain and review contained exculpatory evidence raising a reasonable probability that, but for trial counsel's failure to use it at trial, the results of the trial would have been different); *Shank v.*

---

[10] Harper indicates that he is relying on only an assumption that his counsel failed to obtain the medical records based on Harper's testimony at the motion for new trial hearing that his counsel never showed him any records and on a lack of depth in his counsel's cross-examination of the friend who described Harper's injuries. Because both trial attorneys are deceased and Harper did not otherwise secure an affidavit or sworn statement, that assumption can neither be confirmed nor rebutted. Nevertheless, even assuming that counsel failed to obtain the records, Harper's claim fails.

*State*, 290 Ga. 844, 848 (5) (a) (725 SE2d 246 (2012) (claim of ineffective assistance of counsel fails where appellant did not show that further investigation by counsel would have resulted in any significant exculpatory evidence and thus could not establish prejudice resulting from allegedly deficient investigation). As a result, Harper has not carried his burden of proving "a reasonable probability that, but for the delay, the result of the appeal would have been different." *Chatman* 280 Ga. at 260-61 (2) (e) (citation and punctuation omitted). Accordingly, we discern no abuse of discretion by the trial court in denying the motion for new trial on this ground. See *Hyden*, 308 Ga. at 224 (3).

2. Harper next asserts that he is entitled to a new trial because the trial court abused its discretion in denying his motions for mistrial after the State referenced what Harper describes as previously excluded and "highly prejudicial statements" he made to police. "Whether to grant a motion for mistrial is within the trial court's sound discretion, and the trial court's exercise of that discretion will not be disturbed on appeal unless a mistrial is

19

essential to preserve the defendant's right to a fair trial." *Wilkerson v. State*, 317 Ga. 242, 249 (3) (892 SE2d 737) (2023).

The record reflects that Harper filed a motion for a *Jackson-Denno*[11] hearing on January 22, 2003, alleging that he "may have been interviewed by several agents of law enforcement . . . while he was both in-custody and a suspect of the crime for which he is charged, in regards to the crimes that he is alleged to have committed" and asking for a determination of whether the statements were admissible. At the subsequent hearing on that motion, the State called a sergeant with the Atlanta Police Department, who testified about a statement Harper made in a police car after his arrest and after he was read his *Miranda*[12] rights. In that statement, Harper denied any knowledge of the crimes. After hearing the sergeant's testimony, the trial judge said that the statement to the sergeant "is not admissible, and further stated that "[n]one of this is admissible. I mean, any statement they made is not

---

[11] *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).
[12] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

admissible." But the trial judge later said that he was "thinking out loud" and that "the thing is not closed yet, but that's – I'm just telling you that's where I'm going with that."

When asked at the motion hearing whether the State intended to introduce Harper's statements that he did not know anything, the prosecutor replied that his plan was to obtain a ruling as to whether the statements Harper made were voluntary and then "strategically make a decision" as to whether to introduce them at trial. Later, when the sergeant who testified about the statement he took from Harper was excused as a witness, the trial court asked the prosecutor whether he intended to use "that," and he replied, "no."

The prosecutor then announced that there were other statements by Harper and that the State had a detective available to testify about a different statement. The prosecutor decided not to present that detective's testimony about those other statements at the *Jackson-Denno* hearing, because the testimony would have been "more of the same." The trial court agreed that the State should not "plow the same field." But as explained further below, the prosecutor

21

did allude to one of those other statements at trial, which is what gave rise to the mistrial motion.

On the second day of the hearing, the trial court's staff attorney asked if there had been any ruling on the *Jackson-Denno* issue. The trial judge replied, "There is no mention of any denial of anything, unless the defendants want to bring that up themselves. But the State is not going to be allowed to say anything about *that*. So I grant the *Jackson-Denno* motion." (Emphasis supplied.) However, the trial court never issued a written order on the motion.

At trial, which took place about eight months later, during the State's opening statement, the prosecutor referred to a statement that Harper made to the detective who was not called to testify at the motion hearing. The prosecutor told the jury that Harper said that he did not know anything about the crimes because he was getting "plastered drunk" and smoking marijuana that day with Ruiz and the friend who testified at trial. The prosecutor further asserted that Harper said they were celebrating at Ruiz's apartment, and when Harper became so drunk he was "physically

22

ill," the friend drove Harper home. Harper's trial attorney objected and when the jury was removed, he argued that the statements the prosecutor had referenced were ruled inadmissible at the *Jackson-Denno* hearing and the prosecutors also had indicated that they were not going to use them at trial. Harper's attorney then moved for a mistrial on the grounds that the prosecutor referenced a statement that the prosecutors earlier said they were not going to use, that the trial court indicated it would not allow into evidence, and that introduced bad character evidence about Harper's illegal use of marijuana. Counsel then added that, although he was seeking a mistrial, as a "b[are] minimum" he was asking for a curative instruction.

The trial court called the jury back in and gave a curative instruction to disregard the prosecutor's reference to Harper's statement.[13] Afterward, Harper's trial attorney asserted that he did

---

[13] That instruction was as follows:
I'm instructing you that any statement made by the Assistant District Attorney about any statements that Mr. Harper made there when they went out to the apartment, some police official got

23

not believe the court's instruction cured the problem and renewed his prior motion. The attorney said that his objection went to the whole instruction and specifically to the issue of character. The judge then told the jury, "I'm instructing you that that statement about illegal drug use is not to be considered by you in any way, shape, or form; and that Mr. Harper is presumed to have good character...."[14] The judge asked Harper's attorney if that was

Mr. Harper and allegedly talked to him, and the D.A. has just related statements that Mr. Harper allegedly said to the police officer. I'm instructing you to disregard that. You are not – you are not to consider that in any way, and I have already told you what these lawyers say in these opening statements is not evidence in this case.

You understand what I'm saying? And I'm instructing you, you are to disregard any statement by the district attorney about any statements made by Mr. Harper to the police initially. And I'm instructing you to disregard that and not to consider it in this case, and that's the court's instruction. . . .

And, Ladies and Gentlemen, any statements about any statement that Mr. Harper allegedly – you are to erase any reference to that in this case until further notice.

Has anybody got a problem with that? Anybody going to be unable to do that? And let the record reflect no hands are raised.

[14] The trial court later noted,
Well, the record will reflect what I told the jury. I gave them an instruction, and the record won't reflect the tone of my voice, but I

24

"sufficient," and the attorney replied that it was an instruction in line with the law, but he was still renewing his motion. **«V.7-367»** The trial judge then directed the prosecutor to proceed with his opening statement.

At the conclusion of the State's opening, Harper's other trial counsel renewed the motion for mistrial on the ground that the defense premised its opening on the prosecutors' representation that the statement mentioned in the State's opening would not be used at trial. The trial judge replied that a hearing would be necessary to get "a definitive ruling" on the admissibility of the statement referenced by the prosecutor in opening because "[he did not] think one was ever made." Following an ex parte conference in chambers between the trial judge and defense counsel regarding how the statement affected the defense's theory of the case, and without holding a further evidentiary hearing, the trial judge ruled that

---

forcefully instructed them that they are not to consider this. I went over the character part of it and all of it. So that is excluded, and they indicated they would follow that instruction, and that's all I can say.

25

Harper's statements were "out" because the record reflected that the judge said at the motion hearing that "those statements more than likely wouldn't come in." Nevertheless, the trial court denied the motion for mistrial, and Harper's attorney proceeded with his opening statement.

Harper contends on appeal that because the statement at issue had been orally excluded from evidence and the prosecutors had "unequivocally" stated that they would not seek admission of the statement, the prosecutor acted in bad faith in including it in his opening statement and the mistrial should have been granted.

Although it is true that a prosecutor should limit his opening statement to a recitation of what he expects the evidence will show, see *Jennings v. State*, 288 Ga. 120, 122 (4) (702 SE2d 151) (2010), "[a] conviction will not be reversed if the opening statement was made in good faith, and the trial court instructs the jury that opening statements are not to be considered as evidence during deliberations." *Simmons v. State*, 291 Ga. 705, 709 (6) (733 SE2d 280) (2012) (citation and punctuation omitted). The trial court

instructed the jury in both its preliminary and final instructions that the attorneys' statements were not evidence and further instructed the jury to disregard the prosecutor's description of Harper's prior statement.

Additionally, we cannot say that the trial court abused its discretion in finding that the trial prosecutors acted in good faith and did not knowingly violate any trial court ruling. The State was not represented at trial by the same prosecutors who appeared at the *Jackson-Denno* hearing. Rather, two new prosecutors were assigned to the case a few days before the trial began. The prosecutor who gave the opening statement said at trial that he was unaware that the statement he referenced had been excluded, and if he had known that it was, he never would have mentioned it. In fact, the record contains no clear pretrial ruling excluding the statement. The trial court's oral rulings on the admissibility of Harper's statements to police were ambiguous, and no written order was ever entered. Even the trial judge did not think that a pretrial ruling "was ever made" on the statement used in the prosecution's

opening. Moreover, Harper has not pointed us to, nor could we locate, any representation in the record by the prosecutors that they did not intend to use that statement at trial, although the prosecutors did represent that they would not use the statement on which they presented testimony at the *Jackson-Denno* hearing.

In addition, this Court has determined that "the trial court can negate the potentially harmful effect of improperly introduced evidence by prompt curative instructions rather than by granting a mistrial." *Walker v. State*, 306 Ga. 44, 49 (4) (829 SE2d 121) (2019). See *Allen v. State*, 277 Ga. 502, 504 (3) (c) (591 SE2d 784) (2004) ("[Q]ualified jurors under oath are presumed to follow the instructions of the trial court."). The trial court gave thorough and prompt curative instructions in response to Harper's motion for mistrial. Under these circumstances, we see no abuse of discretion by the trial court in denying the motion for mistrial. See *Simmons*, 291 Ga. at 709 (6).

3. Finally, Harper asserts that he was denied the effective assistance of counsel when his trial attorneys failed to obtain and

introduce medical evidence of the injury to his dominant hand. However, as explained above in Division 1, even if we assume for purpose of analysis that Harper's counsel were deficient in failing to obtain the medical records, Harper has failed to show a reasonable probability that the result of his trial would have been different if those records were introduced into evidence. For these same reasons, Harper's ineffective assistance of counsel claim fails. See *Reed v. State*, 314 Ga. at 538 (2); *Chatman*, 280 Ga. at 261 (2) (e) (recognizing that the prejudice required to show ineffective assistance of counsel under *Strickland* and the prejudice required to establish a due process violation resulting from a delayed appeal are "akin" to one another).

*Judgment affirmed. All the Justices concur.*