NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 12, 2026

S25A1305. GINES v. THE STATE.
S25A1306. MAHONE v. THE STATE.
S25A1307. DAWSON v. THE STATE.

BETHEL, Justice.

Jamel Kweisi Gines, Dontravious Mahone, and Michael Jamar Dawson were convicted of murder and other crimes in connection with the shooting death of Kadarius Medlock.[1] Following the denial

---

[1] The crimes occurred on April 21, 2016. In September 2016, a Fulton County grand jury jointly indicted Appellants for malice murder (Count 1), felony murder (Counts 2-6), first-degree home invasion (Count 12), armed robbery (Count 13), first-degree burglary (Count 14), aggravated assault with a deadly weapon (Count 15), false imprisonment (Count 16), and possession of a firearm during the commission of a felony (Count 17). Gines was separately indicted for felony murder predicated on possession of a firearm by a convicted felon (Counts 8 and 9), financial transaction card fraud (Counts 18 and 20), identity fraud (Counts 19 and 21), and possession of a firearm by a convicted felon (Counts 23 and 24). Mahone was separately indicted for felony murder predicated on possession of a firearm by a convicted felon (Counts 10 and 11) and possession of a firearm by a convicted felon (Counts 25 and 26). Dawson was separately indicted for felony murder predicated on possession of a firearm by a convicted felon (Count 7) and possession of a firearm by a convicted felon (Count 22).

At a December 2018 trial, a jury found Gines and Mahone guilty of all

of their motions for new trial, they appeal, raising numerous claims of error. For the reasons that follow, we affirm.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following. On the morning of April 21, 2016, a neighbor of Medlock's observed a man wearing a safety vest and holding a fluorescent orange traffic cone standing in Medlock's driveway. The neighbor then saw a maroon vehicle enter

counts. The jury acquitted Dawson of malice murder but found him guilty of the remaining counts. The trial court sentenced Gines to serve life in prison without the possibility of parole on Count 1. The court also sentenced Gines to serve life in prison on Count 12, 20 years on Count 14, 10 years on Count 16, 3 years on Count 18, 3 years on Count 20, and 10 years on Count 21, all to be served concurrently with the sentence on Count 1, as well as 15 years consecutive on Count 24. The remaining counts merged or were vacated by operation of law. The trial court sentenced Mahone to serve life in prison without the possibility of parole on Count 1. The court also sentenced Mahone to serve life in prison on Count 12, 20 years on Count 14, and 10 years on Count 16, all to be served concurrently with the sentence on Count 1, as well as 15 years consecutive on Count 26. The remaining counts merged or were vacated by operation of law. The trial court sentenced Dawson to serve life in prison on Count 2. The court also sentenced Dawson to serve 20 years on Count 14, 10 years on Count 16, and 5 years on Count 22, to be served concurrently with the sentence on Count 2, as well as 5 years consecutive on Count 17. The remaining counts merged or were vacated by operation of law.

The Appellants filed timely motions for new trial, which were amended several times. On November 1, 2024, the trial court entered an order denying the Appellants' motions for new trial, as amended. The Appellants thereafter filed timely notices of appeal. Their appeals were docketed to this Court's August 2025 term and submitted for decision on the briefs.

Medlock's driveway "very rapidly" and a man exit the vehicle's passenger side. At 9:50 a.m., another neighbor heard someone talking loudly and angrily inside Medlock's townhome, then heard two "pops." Minutes later, the first neighbor saw two men exit Medlock's townhome and enter the maroon vehicle's passenger side; the vehicle then sped out of the neighborhood. The neighbor confirmed that he saw three men in the vehicle.

An emergency call was made at 9:50 a.m. reporting gunshots at Medlock's home. First responders found the deceased Medlock tied to a bar stool inside the home. Medlock had been shot in the back of the head, and his waist and hands were wrapped with an electrical cord. Investigators later found a second bullet that had penetrated the floor. The home, which belonged to Medlock's uncle, had been ransacked and several items were stolen, including a PlayStation gaming system, a .40-caliber Smith & Wesson firearm, laptops, and various designer-branded accessories.

A traffic cone was left behind after the crimes, and investigators traced its purchase to a nearby home improvement

store, where it was bought with a credit card bearing the name "Lamar Darity." Investigators obtained surveillance footage from the home improvement store showing the person who purchased the traffic cone, a man "with [a] bald head and bushy beard"; surveillance footage from other locations at which the Darity card was used showed the same bald, bearded man using the card. Investigators determined that the credit card had been fraudulently obtained in Darity's name, and they traced the card's transactions in an attempt to identify the person using the card. Through these efforts, investigators learned that the card had been used to pay for car insurance and that Gines was listed as a secondary driver on that insurance policy. After obtaining a photograph of Gines, investigators concluded that he was the bald, bearded man captured on surveillance footage using the Darity card. Investigators also discovered that furniture purchased with the Darity card had been delivered to an apartment leased by Gines and his girlfriend.

Gines's phone records, seized pursuant to a search warrant, led investigators to identify Dawson and Mahone as persons of interest

4

based on their communications with Gines around the time of the crimes. A subsequent search of Mahone's home resulted in the recovery of the stolen PlayStation and gun; other stolen items were found during a search of Dawson's home.

Evidence also established that the maroon vehicle used in the crimes was rented by Gines's girlfriend at his request. The vehicle was rented from a cash car-rental establishment on April 19, two days before the crimes. The owner of the rental company testified that, as part of the company's "polices and procedures," a renter is not permitted to take the rented vehicle outside of a 55-mile radius around Atlanta and that renters are informed of that policy at the time of rental. The vehicle was equipped with a GPS device that placed the vehicle across the street from Medlock's home during the crimes.

At trial, Dawson testified that he rented the vehicle so that he, Gines, and Mahone could drive to Tennessee to deliver six pounds of marijuana. On the morning of the crimes, the three men were asked by "Money," their marijuana contact, to buy the construction items

at the home improvement store while they waited on Money to bring the marijuana. When the Appellants met up with Money at a local pharmacy, Money did not have the marijuana and told them he would take Mahone to the person who would supply it. Mahone and Money then left in the rented vehicle while Gines and Dawson waited at the pharmacy in Money's vehicle. Dawson admitted that he possessed items stolen from Medlock's home, though he claimed Mahone gave them to him in exchange for winning a bet.

*The Appellants' Shared Enumerations*

We turn first to the enumerations of error raised by either two or all three of the Appellants. We then address the Appellants' individual claims.

2. Gines and Mahone both challenge the sufficiency of the evidence supporting their convictions as a matter of federal constitutional due process. Gines also raises a sufficiency challenge under Georgia statutory law. We address — and reject — their arguments in turn.

(a) Gines asserts that the evidence was insufficient as a matter

of federal constitutional due process to support his conviction for burglary because, he says, the State failed to prove every essential element of the crime beyond a reasonable doubt. We disagree.

When evaluating the sufficiency of the evidence as a matter of constitutional due process, we view the evidence in the light most favorable to the verdicts and ask whether the evidence presented at trial was sufficient to authorize a rational jury to find the defendant guilty beyond a reasonable doubt of each essential element of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 US 307, 319 (1979). We leave to the jury "the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." *Chambers v. State*, 320 Ga. 770, 775 (2025) (quotation marks omitted). And we recognize that, "[a]s a general rule, jurors are authorized to make such reasonable inferences and reasonable deductions as ordinarily prudent persons would make in light of their everyday experience and knowledge of human conduct and behavior." *Worthen v. State*, 304 Ga. 862, 868 n.3 (2019) (quotation

marks omitted).

The crime of burglary is committed when the defendant "without authority and with the intent to commit a felony or theft therein … enters or remains within an occupied, unoccupied, or vacant dwelling house of another … ." OCGA § 16-7-1(b). Gines complains that the State failed to prove the "without authority" element of the crime because there was no evidence of a forced entry. But Gines was not indicted solely on the theory that he entered Medlock's home without authority. Rather, the burglary count of the indictment also charged that Gines *remain[ed]* in the home "without authority and with intent to commit a theft therein." (Emphasis supplied.) And evidence that, once inside the home, the Appellants tied up, robbed, and shot Medlock was sufficient evidence for the jury to make the reasonable inference that the Appellants remained in Medlock's home without authority. See *Bell v. State*, 287 Ga. 670, 673 (2013) ("[E]vidence that, once inside the apartment, [appellant] assaulted [the victim] and sought to rob him would support a conviction for 'remain[ing]' in the dwelling without

8

authority." (quoting OCGA § 16-7-1)).

(b) We turn next to Gines's challenge to the sufficiency of the evidence establishing venue as to his convictions for financial transaction card fraud, see OCGA § 16-9-33, and identity fraud, see OCGA § 16-9-121. Specifically, Gines asserts that the State failed to introduce evidence showing that the home improvement store at which he used the Darity card was located in Fulton County.[2] This argument is belied by the record. As the State notes, introduced into evidence at trial was a printout of the transaction for which the Darity card was used at the home improvement store. That exhibit clearly indicates that the transaction was subject to Fulton County taxes, which is sufficient to establish that the home improvement store is located in Fulton County. See *Crawford v. State*, 297 Ga.

---

[2] Gines makes no argument that, under the specific venue statutes applicable to these crimes, venue was improper in Fulton County. See OCGA §§ 16-9-40(a) (establishing venue in prosecutions for financial transaction card fraud under OCGA § 16-9-33, among other statutory offenses); 16-9-125 (establishing venue in prosecutions for identity fraud under OCGA § 16-9-121, among other statutory offenses). His sufficiency challenge is limited to the assertion that the State failed to introduce sufficient evidence to prove that the home improvement store is located in Fulton County, and we limit our analysis accordingly.

680, 682 (2015) ("[T]he State may establish venue by whatever means of proof are available to it and may use both direct and circumstantial evidence."). Thus, to the extent the State was required to establish the store's location in order to establish venue, the transaction printout was sufficient. Accordingly, Gines's argument fails.

(c) In his final sufficiency challenge, Gines asserts that the evidence was insufficient as a matter of Georgia statutory law to sustain his convictions for murder (Count 1), first-degree home invasion (Count 12), false imprisonment (Count 16), and possession of a firearm by a convicted felon (Count 24).[3] Specifically, he contends that the State failed to exclude "every other reasonable hypothesis save that of the guilt of the accused." See OCGA § 24-14-6 ("To warrant a conviction on circumstantial evidence, the proved

---

[3] Gines also challenges the sufficiency of the evidence supporting the guilty verdicts for armed robbery (Count 13) and possession of a firearm during the commission of a felony (Count 17). But the trial court merged those counts for sentencing, so Gines was not sentenced on them. As such, his sufficiency challenge to those counts is moot. See *Milton v. State*, 318 Ga. 737, 742 n.5 (2024).

facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."). Pointing to Dawson's testimony that the Appellants' plan involved only the transport of marijuana to Tennessee, Gines asserts that the State failed to exclude the hypothesis that Gines had no knowledge of and did not assent to a plan to rob or kill Medlock. And he highlights the lack of certain direct evidence like eyewitness testimony, cell phone data, or fingerprint or DNA evidence placing him inside Medlock's home at the time of the crimes. We are not persuaded.

"The fact that the evidence of guilt was circumstantial does not render it insufficient." *Weston v. State*, 320 Ga. 472, 473 (2024) (quotation marks omitted). When a conviction is based on circumstantial evidence, Georgia statutory law requires the State to present sufficient evidence to "exclude every other reasonable hypothesis save that of the guilt of the accused," but this does not mean that "the evidence [must] exclude every *conceivable* inference or hypothesis — only those that are reasonable." Id. at 473–74

11

(quotation marks omitted). And ultimately "[w]hether alternative hypotheses are reasonable … is usually a question for the jury, and this Court will not disturb the jury's finding unless it is insufficient as a matter of law." *Frazier v. State*, 308 Ga. 450, 453 (2020).

Assuming without deciding that all of the evidence against Gines was circumstantial, we conclude that the jury was authorized to reject as unreasonable the hypothesis that Gines intended only to participate in the purchase and transport of marijuana. As discussed above, the State presented evidence showing that Gines orchestrated the short-term rental of the vehicle used in the crimes — a vehicle that could not be driven more than 55 miles from Atlanta without alerting the rental company — and eyewitness testimony and GPS data placed the vehicle outside Medlock's home at the time of the shooting. Eyewitness testimony established that three men were in the vehicle when it sped away from Medlock's home after the crimes. The evidence also showed that Gines traveled with his co-defendants to Alpharetta the morning of the crimes and used the credit card he fraudulently obtained to purchase specific

12

items used in the commission of the crimes. In addition, cell phone data showed a half-hour-long phone call between Mahone's and Gines's phones around the time of the shooting, and Gines's and Mahone's cell phones pinged from the same cell phone tower in the vicinity of Medlock's home before the crimes and in the vicinity of Gines's home after the crimes.

"Conviction as a party to a crime requires proof that the defendant shared a common criminal intent with the direct perpetrators of the crimes," which may be "infer[red] … from the defendant's presence, companionship, and conduct with the other perpetrators before, during, and after the crimes." *Coates v. State*, 310 Ga. 94, 98 (2020) (quotation marks omitted). See also OCGA § 16-2-20. This evidence of Gines's activities before the crimes, his communications with Mahone and Dawson, and his apparent flight from the crime scene show that he shared a common criminal intent with his co-defendants and authorized the jury to reject the hypothesis that Gines did not participate in the crimes and find that he was guilty at least as a party to the crimes. See *Williams v. State*,

313 Ga. 325, 328 (2022) (concluding that evidence was sufficient to support appellant's conviction as a party to the crimes where he planned the shooting, drove one of the vehicles involved in the shooting, communicated with and picked up accomplices after the shooting, and fled from a traffic stop after the shooting). .

(d) Mahone also challenges the sufficiency of the evidence to support his convictions as a matter of constitutional due process. However, Mahone does not address any of his five convictions with any specificity.[4] Instead, he simply complains about inconsistencies in the testimony of certain witnesses and the absence of various types of evidence at trial, like ballistic, fingerprint, or DNA evidence. None of Mahone's criticisms provide any basis for reversal. It is well settled that this Court "does not reweigh evidence or resolve conflicts in testimony" — we leave that to the jury. *Gittens v. State*, 307 Ga. 841, 842 (2020) (quotation marks omitted). Moreover, the

[4] Confusingly, this portion of Mahone's brief concludes with the assertion that the evidence was not sufficient to support a guilty verdict for aggravated battery, though Mahone was neither indicted for nor convicted of aggravated battery.

lack of certain types of evidence at trial does not mean that the evidence that was introduced was insufficient because "there is no requirement that [the State] prove its case with any particular sort of evidence." *Plez v. State*, 300 Ga. 505, 506 (2017). "[C]ompetent evidence" is all that is required. Id. Mahone's argument thus presents no cause for reversal, and this claim fails.

3. The Appellants each argue that they are entitled to a new trial because they were required to appear at trial wearing leg braces under their pants without prior findings from the trial court that shackling was warranted. Our review of the record reflects that this claim is not preserved for appellate review.

The record shows that, following voir dire, the trial court, the Appellants, and the Appellants' counsel retired to the jury room for the trial court to hear a *Batson*[5] challenge, which required the Appellants to walk a short distance between the defense tables and the jury room.[6] Before returning to the courtroom, Dawson's counsel

---

[5] *Batson v. Kentucky*, 476 US 79 (1986).
[6] Dawson's counsel later noted that Dawson had to walk the farthest of the defendants, which counsel estimated was "at least six steps."

15

informed the trial court that the Appellants were wearing leg braces under their pants that impeded their ability to walk normally and expressed concern that the jurors may have noticed their "legs were being dragged and then form[ed] an opinion, 'Well, they must be in jail,' or something is going on." Trial counsel and the trial court engaged in a lengthy exchange about the potential visibility of the leg braces, with the trial court specifically finding that the Appellants were "able to bend their knees" and that "the jurors would not have observed what would appear to be a limp or a dragging as [the Appellants] walked across the courtroom based upon what [the trial court] just observed." The trial court also directed the Appellants' trial counsel to arrive at the courthouse early the next morning "to look at whatever security is on your client[s] to make sure we don't have any issues."

The next day, Dawson, joined by Mahone and Gines, moved for a mistrial, again citing concerns that the jurors noticed the Appellants were "walking in a manner that would indicate that they were restrained." Before addressing the mistrial motion, the trial

16

court made additional factual findings regarding the courtroom configuration, the distance between the defense table and the jury room, and the jurors' location within the courtroom during the Appellants' walk to and from the jury room. The trial court then denied Dawson's motion for mistrial as untimely but requested input from the Appellants as to "any other remedy" with respect to the leg restraints. Only Dawson requested an additional remedy, namely that his leg restraint be removed in the event he decided to testify, and the trial court granted that request. As to counsels' observation of the Appellants' leg restraints, which the trial court explained would "determine whether or not the deputies would be told to remove any and all devices," Mahone's counsel indicated that he had "no issue." Dawson's and Gines' counsel indicated that their clients remained in the same condition as the previous day. In response, the trial court observed that there was "no reason" for either Dawson or Gines "to have to move [around the courtroom] at this point" in the trial, but reiterated that the leg restraints would be addressed in the event any of the Appellants decided to testify.

The Appellants did not raise any further objections or request any additional remedy.

Now, on appeal, the Appellants argue that they are entitled to a new trial because the trial court did not make any specific findings of fact justifying the use of the restraints. But during the entire lengthy exchange with the trial court concerning the restraints, the Appellants did not make any specific objection to the use of the leg braces, nor did they request that the trial court make factual findings to justify the braces' use. Rather, the focus of the discussion and of the Appellants' mistrial motion was the Appellants' concern that the jury may have observed that their ability to walk was impeded and then surmised that they were outfitted with some type of restraint.[7] In the absence of a specific objection or request for such

---

[7] As we understand from the record, the restraints were worn under the Appellants' socks and pants, and the trial court specifically found that the restraints "would not have been observable because [they] would have been underneath socks." The Appellants do not dispute that finding. Indeed, the record shows that counsels' sole concern was whether the Appellants' restricted movement or "bunch[ing]" of their pants would have been perceived by the jurors. We note that decisions of the United States Supreme Court concerning the use of shackles focus on the use of *visible* shackles. See, e.g., *Deck v. Missouri*, 544 US 622, 626 (2005) ("The law has long forbidden routine

findings, this claim is not preserved for appellate review. See *Merritt v. State*, 323 Ga. 23, 32 (2025) (where appellant failed to object to shackling at trial, shackling claim and claim that trial court failed to make specific findings justifying the shackling not preserved for appellate review); *Munn v. State*, 313 Ga. 716, 723–24 (2022) (shackling claim not preserved for appellate review where appellant expressed only general concern at trial as to whether jury could see shackles but failed to make any specific objection to use of shackles). See also *Whatley v. State*, 270 Ga. 296, 302 (1998) ("A party cannot during the trial ignore what he thinks to be an injustice, take his chance on a favorable verdict, and complain later." (quotation marks omitted)).[8]

---

use of *visible shackles* during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need." (emphasis added)). Whether the rule articulated in *Deck* applies to the type of restraints used in this case appears to be unsettled, and the Appellants do not address the issue. Cf. *United States v. Wiley*, 103 F4th 565, 571–72 (9th Cir. 2024) (concluding that "[t]he common law rule identified in *Deck* does not apply to [electronic] ankle monitors"). Because we conclude that this claim was not preserved for appellate review, we need not resolve the issue either.

[8] As we reminded trial courts in *Merritt*, "a defendant's Fifth and Fourteenth Amendment due process rights prohibit the use of physical restraints absent a trial court determination that they are justified by a state

4. The Appellants next argue that they were denied their right to a speedy appeal due to the nearly six-year delay between the filing of their motions for new trial and the resolution of those motions. In assessing a speedy appeal claim, we apply the four-factor balancing test applicable to speedy trial claims set forth in *Barker v. Wingo*, 407 US 514 (1972), looking to the length of the delay, the reason for the delay, the defendant's assertion of his right to a speedy appeal, and the resulting prejudice. See *Hyden v. State*, 308 Ga. 218, 223–24 (2020). Assuming without deciding that the first three factors weigh in the Appellants' favor, their claims nevertheless fail because they have not shown that they were prejudiced by the delay.

"In determining whether an appellate delay violates due process, prejudice, unlike in the speedy trial context, is not

---

interest specific to a particular trial." 323 Ga. at 32 n.8 (cleaned up). The record here provides no clear indication of who ordered the use of the restraints. Nor does it provide much indication concerning why the restraints were employed beyond a suggestion that they were the result of the Appellants not having been granted bond. Indeed, the record suggests that the trial court was not even aware that the restraints were being employed until the subject surfaced in the *Batson* hearing. Notwithstanding the Appellants' failure to formally object on the record and preserve this issue for our consideration, and however the unsettled caselaw discussed in footnote 7 is ultimately resolved, the use of restraints in this case is concerning.

presumed but must be shown." *Veal v. State*, 301 Ga. 161, 168 (2017) (cleaned up), disapproved on other grounds in *Johnson v. State*, 315 Ga. 876, 889 n.11 (2023). "[T]he failure to make this showing in an appellate delay claim [is] fatal to the claim, even when the other three factors weigh in the appellant's favor[.]" Id. As we have explained,

> The prejudice necessary to establish a due process violation based on post-conviction direct appeal delay is prejudice to the ability of the defendant to assert his arguments on appeal and, should it be established that the appeal was prejudiced, whether the delay prejudiced the defendant's defenses in the event of retrial or resentencing. Appellate delay is prejudicial when there is a reasonable probability that, but for the delay, the result of the appeal would have been different.

Id.

In asserting that they were prejudiced by the delay, all three Appellants point to the loss of photographs showing their leg restraints and the purportedly prejudicial message on the jury room whiteboard. As the trial court found and as the Appellants themselves acknowledge, however, the loss of these photographs and other portions of the record was, in part, the *cause* of the delay.

And prejudice is assessed by looking to the delay's *effect*, not its cause. See *Reed v. State*, 314 Ga. 534, 538–39 (2022). In any event, we concluded above that the Appellants' shackling claim is not preserved for appellate review. And only Dawson raises a claim of error related to the message on the jury room whiteboard, a claim that, as explained in Division 19 below, also is not preserved for appellate review. Thus, even if the photographs were lost as a result of the delay, the Appellants had no preserved claim regarding the photographs for the loss to harm and would be unable to establish the requisite prejudice.

Gines and Dawson also argue that they were prejudiced by the delay because they are unable to support their claims of ineffective assistance related to their trial counsels' decision not to call G.A., one of Medlock's neighbors, to testify at trial. In support of this argument, they point to G.A.'s testimony at the motion for new trial hearing regarding post-trial brain surgery and radiation that undermined her recollection of the events surrounding the crimes. But as we discuss in Divisions 7(b) and 21(a) below, the trial record

22

provides a reasonable strategic basis for counsel's decision not to call G.A. to testify, and as a result, Gines and Dawson are unable to sustain their ineffective assistance claims. Post-trial testimony from G.A. would not alter that conclusion. Given these circumstances, the Appellants have "failed to establish a reasonable probability that, but for the delay, the result of [their] appeal[s] would have been different." *Hyden*, 308 Ga. at 227 (quotation marks omitted). Accordingly, their speedy appeal claims fail.

5. Gines and Mahone both assert that the trial court erred by charging the jury on the law of conspiracy over their objections. We disagree.

"[O]nly slight evidence is necessary to warrant a charge on the subject of conspiracy." *Smith v.* State, 306 Ga. 753, 758 (2019). Even where, as here, the defendant is not charged with conspiracy in the indictment, a jury charge on the subject of conspiracy is appropriate "when the evidence tends to show a conspiracy." Id. (quotation marks omitted). To establish a conspiracy, the State must show only "that two or more persons tacitly came to a mutual understanding

23

to pursue a criminal objective," and even in the absence of evidence of an express agreement, that mutual understanding may be inferred "from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances." *O'Neal v. State*, 316 Ga. 264, 269 (2023) (cleaned up). More than slight evidence supported the conspiracy charge here.

The State presented evidence showing that the Appellants went to the home improvement store to purchase items used in the crimes and that they rode to Medlock's home in the vehicle rented at Gines's behest. Neighbors reported seeing three men fleeing the crime scene together. Cell phone records showed that Gines's and Mahone's phones were in contact during the crimes and that all three men remained together for some time after fleeing the crime scene. And finally, items stolen from Medlock's home were later found in Mahone's and Dawson's possession. The jury charge on conspiracy was authorized, and the trial court did not err by giving it. See id.

6. Mahone and Dawson both challenge the trial court's refusal

24

to allow a juror to testify at a post-conviction hearing about whether the juror observed the Appellants' leg restraints or learned of a purportedly prejudicial message on the jury room whiteboard.[9] Both assert that this testimony was necessary to support their claims on appeal related to the restraints and the whiteboard message. But we have already concluded above that the Appellants' claim that the trial court erred by failing to make factual findings to support the use of the restraints is not preserved for appellate review, and the Appellants do not assert a separate claim that the trial court erred in its findings that the restraints were not visible to the jury. Only Dawson raises a claim of error related to the message on the jury room whiteboard, and as we discuss below in Division 19, Dawson did not preserve the claim for appellate review. Thus, regardless of whether the trial court erred by refusing to permit the juror to

---

[9] The exact wording of the message written on the whiteboard is unclear. The substance of the message was not made part of the trial record at the time the message was discovered, and at the motion for new trial hearing, none of the Appellants' trial counsel could recall exactly what the message said. Trial counsel did agree that the message was "adverse" to the Appellants and urged conviction.

testify, any possible harm arising from the exclusion of the juror's testimony was inconsequential because the claims of error related to that testimony were not preserved for appellate review.. Cf. *Tedder v. State*, 320 Ga. 29, 39 (2024) ("[B]ecause we have already concluded that there was no error in the trial court's response to the jury's question, any error in excluding evidence of harm [in the form of juror testimony] arising from that response is itself harmless."). See also *Palmer v. State*, 310 Ga. 668, 677 (2021) ("It is fundamental that harm as well as error must be shown for reversal." (cleaned up)).

### S25A1305 Gines v. The State

7. Gines contends that trial counsel rendered constitutionally ineffective assistance in two respects. To prevail on a claim of ineffective assistance, an appellant must show both that trial counsel's performance was professionally deficient and that he was prejudiced by that deficient performance. See *Strickland v. Washington*, 466 US 668, 687 (1984). To show deficient performance, "an appellant must overcome the strong presumption that his

counsel's conduct falls within the broad range of reasonable professional conduct and show that his counsel performed in an objectively unreasonable way in the light of all the circumstances and prevailing norms." *Thurman v. State*, 311 Ga. 277, 278 (2021) (cleaned up). And to show prejudice, an appellant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 278–79 (quotation marks omitted). In reviewing a trial court's decision on a claim of ineffective assistance, "we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." *Jackson v. State*, 306 Ga. 475, 479 (2019) (cleaned up). With these principles in mind, we address Gines's ineffective assistance claims in turn.

(a) First, Gines argues that trial counsel was deficient for failing to move to strike the jury panel after, he says, potential jurors were exposed to objectionable language in the jury room. The record reflects that, after jury selection was complete, the Appellants, their

27

counsel, and the trial court retired to the jury room for the court to hear argument on the Appellants' *Batson* challenges. The first issue the trial court addressed inside the jury room was an unspecified message written on a whiteboard in the room, with the court instructing the bailiff, "[W]homever is in this jury room, they are not to write on the board." The trial court also indicated, "That's going to have to be wiped again so that that is not visible before we bring the jury back here." Nothing in the record indicates what was written on the whiteboard, though Gines, as well as his co-defendants, insist that the substance of the message was prejudicial. None of the Appellants raised any objection to the trial court's handling of this issue.

Now, on appeal, Gines asserts that trial counsel should have moved to strike the jury panel for exposure to the whiteboard message and that counsel's failure to do so constitutes deficient performance. In its order denying Gines's motion for new trial, however, the trial court found that no juror saw what was written on the whiteboard. That finding was based on the fact that the

message was discovered by the trial court "after [the Appellants] had used the jury room to consider their peremptory strikes and before any prospective juror had had an opportunity to use the jury room." The trial court also noted that, "[h]ad the circumstances been such that any juror could have entered the jury room while the language at issue was on the whiteboard, all three defense counsel would have vigorously objected and moved for a mistrial."

> As we have explained repeatedly, a trial court's factual findings made in the course of deciding an ineffective assistance of counsel claim will be affirmed by the reviewing court unless clearly erroneous. Under this highly deferential clear-error standard, we will not reverse a trial court's factual findings if there is any evidence to support them, and this holds true even if the findings are based upon circumstantial evidence and the reasonable inferences which flow from them.

*Jordan v. State*, 305 Ga. 12, 17 (2019) (cleaned up). The record supports the trial court's finding that no juror saw the message written on the whiteboard. Thus, a motion to strike the jury panel on the basis asserted by Gines would have been meritless, and the failure to make a meritless motion to strike does not constitute deficient performance. See *Williams v. State*, 305 Ga. 776, 779

(2019).

(b) Gines also challenges trial counsel's failure to call G.A., one of Medlock's neighbors, as a witness at trial, asserting that G.A.'s testimony would have been exculpatory because G.A. reported seeing a white man outside Medlock's home on the morning of the crimes, which is inconsistent with the Appellants' race. Trial counsel's decision as to which defense witnesses to call "is a matter of trial strategy and tactics, and does not amount to deficient performance unless [counsel's decision is] so unreasonable that no competent attorney would have made [it] under similar circumstances." *Wimberly v. State*, 302 Ga. 321, 324 (2017) (quotation marks omitted). Gines has not established that counsel acted objectively unreasonably by not calling G.A. to testify.

As an initial matter, Gines's trial counsel was not asked at the motion for new trial hearing why he did not call G.A. as a witness.[10]

---

[10] Gines asserts that his trial counsel testified that his failure to call G.A. to testify was a "mistake," but the portion of the record Gines cites in support of this claim directs us to the testimony of *Dawson's* trial counsel, not Gines's. Notably, our review of the record indicates there was no testimony at the motion for new trial hearing describing the failure to call G.A. as a "mistake."

"Not securing trial counsel's testimony on [this point] makes it particularly difficult for [an appellant] to overcome the strong presumption that trial counsel's actions were part of a deliberate trial strategy." *Lee v. State*, 318 Ga. 412, 423 (2024) (quotation marks omitted). And the record offers a reasonable strategic basis for not calling G.A. to testify — G.A.'s own testimony at the motion for new trial hearing. There, G.A. testified that she was not home when the crimes occurred, did not know Medlock or any of her other neighbors at the time of the crimes, and did not want to be a witness at trial. The testimony of Mahone's trial counsel, who was asked why he decided not to call G.A. to testify, underscores that strategic basis. Specifically, counsel testified that he decided not to call G.A. because he believed her testimony "wasn't of any value" to the defense. And the record reflects that Dawson's trial counsel cross-examined a testifying detective about his interview with G.A. rather than call her as a witness, with the detective confirming that G.A. reported seeing "before the incident, a white male and a white woman at the victim's home." The detective clarified on redirect

31

examination, however, that he believed G.A. was describing persons she saw *after* the shooting because her description of those people and where she saw them was consistent with other neighbors' appearances and their own reports about where they were positioned after the shooting. In light of this record, Gines has failed to establish that counsel's decision not to call G.A. to testify was so unreasonable that no competent attorney would have made the same decision under the circumstances. See *Wimberly*, 302 Ga. at 324 (trial counsel's strategic decision not to call witnesses to testify at trial was reasonable where witnesses, who were working across the road from the crime scene while the crimes occurred, did not see anyone get shot and counsel believed their testimony would not help the defense); *Jackson*, 306 Ga. at 480 (no deficient performance where trial counsel concluded that testimony of witness who did not observe altercation between defendant and victim would not have added anything particularly useful to case and made reasonable strategic decision not to call her to testify at trial).

8. In his final claim of error, Gines asserts that he suffered

32

cumulative prejudice as a result of the trial court's errors and trial counsel's ineffective assistance. However, because Gines has not shown error in any respect, there are not multiple errors to consider cumulatively, and this claim fails. See, e.g., *O'Neal*, 316 Ga. at 271.

*S25A1306 Mahone v. The State*[11]

---

[11] We note that Mahone's brief presents this Court with 18 enumerations of error, which his appointed counsel unwisely attempted to set forth in a mere 25 pages of argument. As reflected in our resolution of these claims of error below, counsel completely omitted essential portions of the argument necessary for the proper presentation of many of these claims, and still more claims were not preserved for appellate review—a fact that could be gleaned from an ordinary review of the record and applicable case law. Counsel's poor performance is further demonstrated by the elementary errors that riddle his brief. A *direct quotation* of a sampling of these obvious and egregious errors includes: "The search warrant conr=tained deliberate falsehoods, statements mad in reckless disregrad for th truth and material omissions requiring a hearing" and "Sdo, in fact, Defenant Dawson testified nd blamed Mahone." These types of errors are confounding and inexcusable.

And, troublingly, this is not an isolated event for Mahone's counsel, as a review of our recent docket reflects. See, e.g., *Taylor v. State*, 323 Ga. 91, 98 (2025) (noting "perplexing" argument that "life without parole for an armed robbery" is disproportional where appellant "was not alleged to have committed, let alone indicted for, armed robbery" and deeming related argument abandoned under Supreme Court Rule 22 where appellant "repeat[ed] (almost verbatim) the argument he made in support of his first contention"); *Profet v. State*, 322 Ga. 731, 737 (2025) (deeming abandoned both challenge to evidentiary sufficiency where appellant "fail[ed] to offer any argument at all as to why the evidence was not sufficient" and claim of trial court error where "none of the cited pages include a ruling by the trial court" and appellant did not "otherwise identif[y] what evidentiary ruling or rulings he [was] challenging on appeal"). This is not the kind of advocacy we expect of Georgia lawyers.

9. Mahone argues that the trial court erred by denying his motion for new trial on the "general grounds." Under Georgia law, a trial court is authorized to grant a new trial "[i]n any case when the verdict of a jury is found contrary to evidence and the principles of justice and equity," OCGA § 5-5-20, or when "the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding," OCGA § 5-5-21. "Grounds for a new trial under these Code sections are commonly known as the 'general grounds,' and the two statutes give the trial court broad discretion to sit as a thirteenth juror and weigh the evidence on a motion for new trial alleging these general grounds." *Muse v. State*, 316 Ga. 639, 653 (2023) (quotation marks omitted). Whether to grant a new trial on the general grounds is a decision "left to the sole discretion of the trial court." *Whisnant v. State*, 322 Ga. 253, 259 (2025) (quotation marks omitted). Thus,

---

We remind counsel that admission to practice before this Court is not a right, but a privilege that can be lost. Counsel is admonished to comply in the future with the Rules of this Court, and we emphasize his obligation to review and proofread a brief before filing.

"[o]n appellate review, our role is limited to determining whether the trial court exercised that discretion," and in the absence of "affirmative evidence to the contrary, we presume that the trial court did so." Id. Nothing in the trial court's order reflects, nor does Mahone argue, that the trial court failed to properly exercise its discretion, so this claim presents nothing for our review. See *Muse*, 316 Ga. at 653 ("Once we have determined that the trial court properly exercised its authority in refusing to grant a new trial on the general grounds, we cannot review the merits of that decision[.]" (quotation marks omitted)).

10. Next, Mahone argues that the oral sentence of "life for murder" announced by the trial court at the sentencing hearing was "impermissibly increased" to life without parole when the sentence was memorialized in writing, and he asserts that this discrepancy deprived him of various rights. Mahone has not shown error.

It is axiomatic that an oral pronouncement by a trial court during a hearing is not a judgment and, consequently, is not binding "until it is reduced to writing and entered as a judgment." *Williams*

35

*v. Williams*, 295 Ga. 113, 114 (2014). Thus, "[a]n oral declaration as to what the sentence shall be is not the sentence of the court; the sentence signed by the judge is." *Curry v. State*, 248 Ga. 183, 185 (1981). "Moreover, until an oral pronouncement is memorialized [in writing], the trial judge had broad discretion to amend, alter, or completely change his decision[.]" *Burns v. State*, 313 Ga. 368, 375 n.4 (2022) (quotation marks omitted). This discretion is circumscribed, however, where the defendant begins to serve his sentence before the written sentence is entered; under those circumstances, the sentence as pronounced orally may not be increased when memorialized in writing. *Curry*, 248 Ga. at 185 (citing *Carridine v. Ricketts*, 236 Ga. 283, 288, 290 (1976)).

Mahone asserts that he began serving the oral sentence of "life for murder" upon the sentencing hearing's conclusion because he was "immediately taken back to jail." So, his argument goes, the trial court's written sentence of life without parole, which was filed with the court clerk three days after the sentencing hearing, amounts to an impermissible increase in his sentence. But this

argument is belied by the record. To begin, Mahone's assertion that his sentence was impermissibly increased when memorialized in writing is specious, at best: the trial court's oral pronouncement of "life for murder" followed a colloquy between the court and the parties regarding Mahone's status as a recidivist under OCGA § 17-10-7(a) and (b), which required that he be sentenced to serve life without the possibility of parole. And even assuming the written sentence constitutes an increased sentence, Mahone has not shown that he began serving the sentence of "life for murder" before the trial court signed the written sentence. Contrary to Mahone's assertion that the oral pronouncement was made two days before the court signed the written sentence, the appellate record plainly reflects that the sentencing hearing occurred on December 17, 2018, and the trial court signed the written sentence that same day. Mahone cites no legal authority, nor are we aware of any, for the proposition that the mere fact he remained in custody following the sentencing hearing establishes that he immediately began serving

his sentence.[12] Given these circumstances, Mahone has failed to demonstrate any error in his sentence, and this claim fails. See *Curry*, 248 Ga. at 185.

11. Mahone complains that the trial court denied him a "full and fair opportunity" to litigate his motion to suppress cell phone records and asserts that this deprived him of "his Fourth Amendment rights and due process." But Mahone's skeletal argument fails to set forth even an inkling as to the factual basis for this claim. He instead provides only bare citations to the record, and those cited portions of the record reflect that the trial court in fact held a hearing on his motion to suppress, later heard argument on that same motion on multiple occasions, and entertained two motions for reconsideration filed as to that motion. Mahone himself even acknowledges in his appellate brief that the court heard

---

[12] To the contrary, this Court has previously looked upon that proposition with skepticism. See *Stephens v. State*, 289 Ga. 758, 764 (2011) ("even assuming (dubiously) that Appellant began serving his sentence when the court asked him to go with the deputy at the sentencing hearing, and further assuming (even more dubiously) that Appellant had a legitimate expectation of finality in his sentence at that point …").

evidence on the motion to suppress. As Mahone provides no substantive argument as to how the hearings that were actually held were legally deficient and makes no effort to explain what more the trial court should have done to ensure that he had a "full and fair opportunity" to litigate his motion, Mahone has failed to meet his burden of showing error affirmatively by the record, and this claim fails. See *Soto v. State*, 303 Ga. 517, 523 (2018) ("[I]t is not this Court's responsibility to cull the record in search of support for the appellant's claims[.]").

12. Mahone argues that the trial court erred by not severing his trial from that of his co-defendants. The record reflects, however, that Mahone never filed a motion for severance in the trial court. While Mahone's co-defendants moved for severance, Mahone did not join that motion. As such, Mahone has waived the issue of whether the trial court erred by not granting severance. See *Leonard v. State*, 316 Ga. 827, 836 (2023) ("Because [appellant] failed to obtain a ruling on the [severance] issue, he cannot raise it for the first time in this Court." (cleaned up)); *Johnson v. State*, 301 Ga. 205, 208

39

(2017) (severance issue not preserved for review where appellant did not move for severance in trial court, failed to join co-defendant's motion, and did not request to be tried separately).

13. Mahone next asserts that the trial court erred by charging the jury on the law of parties to a crime. Mahone did not object to this jury charge at trial, so we review this claim only for plain error. See *Grullon v. State*, 313 Ga. 40, 44–45 (2021); OCGA § 17-8-58. "In order for this Court to review the jury charge for plain error, the accused must not have affirmatively waived the alleged error or defect." *Faust v. State*, 302 Ga. 211, 215 (2017). This means that "the appellant's argument that the trial court deviated from a legal rule must [not] have been intentionally relinquished or abandoned by the appellant." *Grullon*, 313 Ga. at 46 (cleaned up).

Here, the record shows that, in a pre-trial filing, the State requested that the jury be charged on the law of parties to a crime, and the trial court indicated at the charge conference that the charge would be given. Later, during a break in closing arguments and before the jury was charged, Mahone's counsel raised the issue of his

failure to object during the earlier charge conference to the State's requested jury charge on conspiracy. In making that objection, counsel argued that "party to a crime is the proper vehicle by which the State's theory for proving criminal liability is to be applied." And during deliberations when the jury requested the definitions of "party to the crime" and "conspiracy," Mahone joined Gines's request that the trial court recharge the jury only on the law of parties to a crime. Given these circumstances, we conclude that Mahone affirmatively waived his right to challenge the trial court's action. See *Hughes v. State*, 310 Ga. 453, 457 (2020) (appellant affirmatively waived any error in answering jury's questions on particular issue where he agreed that trial court's proposed response was the appropriate means by which to answer the questions); *Faust*, 302 Ga. at 215–16 (appellant affirmatively waived claim that trial court erroneously gave a particular jury instruction where appellant "specifically agreed" to the giving of the instruction).

14. In his final claim of trial court error, Mahone points to the trial court's exclusion of Dawson's parents from the courtroom while

Dawson testified and asserts that this violated his right to a public trial. As this Court has explained, "when a criminal defendant seeks to assert that a trial court's action deprived him of the right to a public trial," the defendant must make "a contemporaneous objection … on the record at the earliest possible time. Otherwise, the issue is deemed waived on appeal." *Benton v. State*, 300 Ga. 202, 205 (2016) (quotation marks omitted). The record here reflects that Mahone did not object to the exclusion of Dawson's parents from the courtroom, nor did he join Dawson's motion for mistrial as to that ruling. As such, Mahone has waived his right to appellate review of this claim. See id.

15. Next, Mahone complains that the appellate record in this case is incomplete and thus, he says, unreliable. The only specific items that Mahone contends are missing from the record are photographs of the Appellants' leg braces, discussed in Division 3 above, and of the message written on the jury-room whiteboard, mentioned in Division 6 above and in Division 19 below. Nevertheless, Mahone insists that the absence of these photographs

"effectively denies" him his right of appeal such that he is entitled to a new trial. We disagree.

In November 2023, the State filed a motion to complete the record, which indicated that "documentary and media exhibits from the trial of the case … are absent from the record." Attached to the motion was an appendix identifying the missing exhibits that could be recreated. The motion noted the State had been unable to locate two State's exhibits from trial (surveillance videos). Also missing was a copy of one of the trial court's exhibits — a photograph showing the message written on a whiteboard in the jury room. The trial court subsequently held a hearing on the motion at which it heard testimony from multiple witnesses on the missing exhibits. The trial court entered an order granting the motion to complete the record, accepting the replacement exhibits provided by the State. As to the exhibits for which the State was unable to find replacements, the trial court found the record sufficient for purposes of appeal and ruled that the record was complete.

Where, as here, "an otherwise verbatim transcript is missing

43

only one or a few parts of the trial, the appellant is not entitled to a new trial unless he alleges that he has been harmed by some specified error involving the omitted part and shows that the omission prevents proper appellate review of that error." *Muse*, 316 Ga. at 671–72 (quotation marks omitted). Mahone did not raise any claim of error relating to the whiteboard message, and while he has alleged error that implicates the missing photographs of the Appellants' leg braces,[13] he has failed to show — or make any argument at all — that the omission of these photographs has prevented proper appellate review of that alleged error. Indeed, the trial court went to some length to create a robust record with respect to the shackling issue, and in any event, as we discussed above, Mahone's enumeration of error relating to the shackling was not preserved for appellate review. Accordingly, Mahone has not shown that he is entitled to a new trial on the basis of the missing

---

[13] We note that the record raises some question as to whether the photographs of the leg braces actually exist: trial counsel for all three Appellants testified at the motion for new trial hearing that they did not take any photographs of their clients wearing the leg braces.

photographs, and this claim fails. See id.; *Gadson v. State*, 303 Ga. 871, 878–79 (2018).

16. Mahone asserts that trial counsel rendered constitutionally ineffective assistance in five respects. As detailed above, the two-part *Strickland* standard applies to these claims, which requires Mahone to demonstrate both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. See 466 US at 687. Mahone has not met his burden.

(a) We first address Mahone's claim that trial counsel was ineffective by not calling G.A. to testify at trial. Like Gines, Mahone has not established that counsel acted unreasonably by not calling G.A. to testify. As we noted above, Mahone's trial counsel testified that he decided not to call G.A. because he believed her testimony "wasn't of any value" to the defense. G.A.'s testimony at the motion for new trial hearing demonstrates that counsel's conclusion on this point was a reasonable one, and Mahone has not shown that counsel's strategic decision not to call G.A. as a witness was so unreasonable that no competent attorney would have made the

same decision under the circumstances. See *Jackson*, 306 Ga. at 480 ("Trial counsel's decision as to which defense witnesses to call is a matter of trial strategy and tactics, and tactical errors in that regard will not constitute ineffective assistance of counsel unless those errors are unreasonable ones no competent attorney would have made under similar circumstances." (cleaned up)). Because trial counsel was not deficient in this respect, Mahone's ineffective assistance claim fails.

(b) Turning to Mahone's remaining claims of ineffective assistance, he asserts that counsel was ineffective by (1) failing to make either an opening statement or a "meaningful" closing argument; (2) failing to file a written motion challenging the racial composition of the grand and petit juror lists; (3) failing to file a written motion for severance; and (4) failing to file a written motion to suppress his cell phone records. We conclude that Mahone has failed to meet his burden of affirmatively proving that he was prejudiced by any alleged deficiencies.

The deficient-performance and prejudice prongs of the

*Strickland* inquiry are separate and distinct, and the defendant bears the burden of satisfying both parts to obtain relief. See 466 US at 693 ("Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense."); *Davis v. State*, 306 Ga. 140, 144 (2019) ("Simply because a defendant has shown that his trial counsel performed deficiently does not lead to an automatic conclusion that he was prejudiced by counsel's deficient performance."). If the defendant fails to meet his burden as to either prong, the reviewing court is not obligated to consider the other. See *Taylor v. State*, 315 Ga. 630, 647 (2023). We focus here on prejudice because Mahone has not even attempted to develop a substantive argument as to the prejudice prong on any of these claims. And as *Strickland* directs, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, … that course should be followed." 466 US at 697.

The standard for demonstrating prejudice is a familiar one: a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. Conclusory allegations of prejudice are insufficient to make this showing. See *Dent v. State*, 303 Ga. 110, 117–18 (2018). Rather, *Strickland* imposes "a general requirement that the defendant *affirmatively prove* prejudice." 466 US at 693 (emphasis added). At a minimum, this requires the defendant to engage with "the totality of the evidence before the judge or jury" and grapple with the ways in which counsel's errors might have affected the factfinder's consideration of the evidence presented at trial. See id. at 695–96 ("Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect."). But Mahone has not done this. In fact, Mahone mentions prejudice only with respect to one of the four claims at issue here, and he does so only in passing, asserting without elaboration that he "made a clear showing of prejudice." But again, a conclusory

allegation is insufficient to demonstrate prejudice. See *Dent*, 303 Ga. at 117–18. What's more, we have performed our own *Strickland* prejudice evaluation, and in light of the overwhelming evidence of Mahone's guilt, even assuming that counsel performed deficiently in the ways Mahone alleges, we do not see that Mahone was prejudiced by those deficiencies. See *Strickland,* 466 US at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."); *Lee v. State*, 314 Ga. 724, 732 (2022) (where evidence of guilt is overwhelming, defendant is unable to show a reasonable probability that the trial result would have been different). As such, these claims of ineffective assistance fail.

(c) As we understand his final argument in the ineffectiveness context, Mahone asserts that trial counsel's deficiencies, considered "[i]ndividually and collectively," cumulatively amounted to a constructive denial of counsel. See *United States v. Cronic*, 466 US 648, 659 (1984) (describing constructive "complete denial of counsel" exception to *Strickland* prejudice requirement when counsel

49

"entirely fails to subject the prosecution's case to meaningful adversarial testing"). Mahone fails to engage in any actual legal analysis in support of this claim, instead relying on a string of quoted language from various decisions with no explanation as to how those decisions apply to the facts of this case.

In any event, "*Cronic*'s 'constructive denial of counsel' exception to the general *Strickland* standard is a narrow one that applies only when there was a breakdown in the adversarial process, such that counsel entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." *Wainwright v. State*, 305 Ga. 63, 68 (2019) (quotation marks omitted). Mahone's allegations that trial counsel was ineffective at specific points of trial does not meet this stringent standard, *Cronic*'s narrow exception is not triggered in this case, and *Strickland*'s actual-prejudice standard remains the appropriate measure by which to assess Mahone's claims. See *Sullivan v. State*, 301 Ga. 37, 40 n.3 (2017).

When considering whether the combined prejudicial effect of trial counsel's assumed deficiencies warrants a new trial, see

50

*Schofield v. Holsey*, 281 Ga. 809, 11 n.1 (2007), overruled on other grounds by *State v. Lane*, 308 Ga. 10, 17 (2020), "we have stated that a defendant must show that the cumulative prejudice from any assumed deficiencies showed a reasonable probability that the results of the proceeding would have been different in the absence of the alleged deficiencies." *Waters v. State*, 317 Ga. 822, 832 (2023) (cleaned up). We presumed deficient performance of counsel in four respects. But in light of the strong evidence of Mahone's guilt, the collective effect of these presumed errors is not sufficiently harmful to warrant a new trial. See *Lee*, 314 Ga. at 733.

### *S25A1307 Dawson v. The State*

17. Dawson claims that the State engaged in prosecutorial misconduct by falsifying the affidavit supporting Dawson's arrest warrant after the fact to include a probable cause statement, but this claim is not preserved for appellate review.

It appears this claim has its genesis in the copies of Dawson's arrest warrant that the State presented at the evidentiary hearing on Dawson's motion to suppress. At the hearing, which was held just

51

two days after the motion was filed, the State initially presented a copy of Dawson's arrest warrant without the probable cause statement. Dawson's motion to suppress challenged the existence of probable cause supporting his arrest, and the trial court granted the State a continuance to secure a copy of "whatever affidavit in whatever form it might have been [that] was before the magistrate." When the hearing resumed a week later, the State presented a copy of the arrest warrant affidavit that included the probable cause statement. This copy was admitted without objection and, notably, without any assertion of prosecutorial misconduct in the affidavit's preparation. The trial court denied Dawson's motion to suppress.

To preserve a claim of prosecutorial misconduct for appellate review, a contemporaneous objection must be made on the record at the earliest possible time. See *Troutman v. State*, 320 Ga. 489, 492–93 (2024); *Atkinson v. State*, 301 Ga. 518, 521–22 (2017). Dawson first raised the issue of prosecutorial misconduct with respect to the arrest warrant affidavit in his amended motion for new trial. Because a proper contemporaneous objection was not raised and

could have been, Dawson's claim of prosecutorial misconduct is not preserved for appellate review. See id.

18. Dawson contends that he was deprived of a meaningful opportunity to appeal and that his rights under the federal and state constitutions were violated because, he says, the State lost or destroyed critical exhibits from trial. Like Mahone, Dawson complains that photographs of the Appellants' leg braces and of the message written on the jury-room whiteboard are missing from the record. He also asserts, without any citation to the record, that copies of the arrest warrant affidavits he alleges were falsified and "[h]andwritten jury notes, investigator interview summaries, and other materials" are missing from the record. Though Dawson raises generalized claims of harm related to these missing items, he has failed to show that the omission prevented proper appellate review of his claims of error. See *Muse*, 316 Ga. at 671–72. His claims of error related to the shackling, discussed in Division 3 above, and the message on the jury-room whiteboard, discussed in Division 19 below, were not preserved for appellate review, and he does not

explain how omission of the other materials he identifies as missing impacted appellate review of his claims, particularly in light of the robust record the trial court created in resolving the State's motion to complete the record. Dawson thus has failed to show that he is entitled to a new trial on this basis, and this claim fails. See id.; *Gadson*, 303 Ga. at 878–79.

19. Dawson argues that a message left on a whiteboard in the jury room improperly exposed the jury to extraneous prejudicial information.[14] We discussed the factual basis for this claim in Division 7(a) above, and as we noted there, the record reflects that none of the Appellants, including Dawson, raised any objection to the trial court's handling of the message after it was discovered. So,

---

[14] Dawson, who is representing himself on appeal with the assistance of stand-by counsel, characterizes this claim as one involving jury "embracery." Embracery, however, is a statutory offense. See OCGA § 16-10-91(a) ("A person commits the offense of embracery when he … [w]ith intent to influence a person summoned or serving as a juror, communicates with him otherwise than is authorized by law in an attempt to influence his action as a juror"). And Dawson cites no authority for the notion that a claim of embracery may form the basis of a motion for new trial. But we recognize that Dawson is proceeding pro se, and with that in mind, we read his brief generously. As we understand his argument, Dawson's real complaint is that the jury was exposed to extraneous prejudicial information or improper outside influence by way of the message written on the whiteboard.

because Dawson failed to object, this claim of error is not preserved for our review. See *Clark v. State*, 315 Ga. 1, 5 (2022).

20. Dawson asserts that his rights under the Confrontation Clause were violated when a substitute pathologist was permitted to testify about the findings of the absent pathologist who actually conducted Medlock's autopsy. As Dawson acknowledges, he failed to object to the medical examiner's testimony on this basis at trial, so we review this claim only for plain error. See OCGA § 24-1-103(d); *State v. Herrera-Bustamante*, 304 Ga. 259, 263–64 (2018). To prevail on plain-error review, Dawson "must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity[,] or public reputation of judicial proceedings." *Herrera-Bustamante*, 304 Ga. at 264 (cleaned up). We conclude that Dawson's claim fails on the second prong of this test.

Under the Confrontation Clause of the Sixth Amendment to the United States Constitution, "[i]n all criminal prosecutions, the

55

accused shall enjoy the right … to be confronted with the witnesses against him." The Confrontation Clause "bars admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had … a prior opportunity for cross-examination." *Davis v. Washington*, 547 US 813, 821 (2006) (quotation marks omitted). "A critical portion of this holding," the *Davis* Court explained, "is the phrase 'testimonial statements,'" because "[o]nly statements of this sort" implicate Confrontation Clause concerns: "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." Id. Thus, a Confrontation Clause claim can succeed only if the challenged statement was: (1) testimonial, meaning that it was made with the "primary purpose" of "establish[ing] evidence that could be used in a future prosecution," *Denson v. State*, 307 Ga. 545, 548 (2019) (quotation marks omitted), and (2) hearsay, that is, "offered in evidence to prove the truth of the matter asserted," *Carter v. State*, 302 Ga. 200,

56

204 (2017) (quotation marks omitted).

Dawson's Confrontation Clause claim focuses on the substitute pathologist's testimony regarding Medlock's cause of death which was derived from the substitute's review of the autopsy report prepared by the original pathologist. In this context, the United States Supreme Court has held that the Clause applies to forensic reports and safeguards a defendant's right to cross-examine the author of such a report prepared in anticipation of prosecution that is admitted to prove the defendant's guilt. See *Melendez-Diaz v. Massachusetts*, 557 US 305, 309–12 (2009) (forensic analyst's certification prepared in connection with a criminal investigation or prosecution is "testimonial" and thus subject to confrontation under the Sixth Amendment); *Bullcoming v. New Mexico*, 564 US 647, 658–63 (2011) (prosecution may not introduce one lab analyst's written findings through the testimony of another). The holdings in *Melendez-Diaz* and *Bullcoming* focused on whether the forensic reports at issue constituted "testimonial statements." Later, in *Smith v. Arizona*, the Court examined the contours of the other

component of a Confrontation Clause claim in the forensic report context, namely, whether an absent lab analyst's statements come into evidence for their truth when a testifying expert recites the analyst's statements as the basis for his opinion. 602 US 779, 783 (2024). And the Court answered that question in the affirmative. Id. at 802–03 ("A State may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her. Neither may the State introduce those statements through a surrogate analyst who did not participate in their creation. And nothing changes if the surrogate … presents the out-of-court statements as the basis for his expert opinion. Those statements … come into evidence for their truth — because only if true can they provide a reason to credit the substitute expert." (citations omitted)).

The statements at issue here are the absent pathologist's written statements contained in the autopsy report that she prepared which were related by the pathologist who testified at trial to support his opinion about the cause of death. Dawson relies

primarily on *Smith* to support his assertion that the admission of this testimony resulted in a Confrontation Clause violation, apparently viewing *Smith* as establishing a brightline rule that such a violation occurs anytime a testifying expert conveys statements made in a forensic report prepared by a different, non-testifying expert. But Dawson reads too much into *Smith*. As we detailed above, a Confrontation Clause violation occurs if the challenged statements were both hearsay and testimonial. *Smith* addresses only one of those conditions — whether the non-testifying expert's written statements were admitted "for the truth." See id. at 800. The Court expressly declined to assess whether the statements in the forensic report at issue were testimonial in nature. See id. at 800–01; see also id. at 804 (Thomas, J., concurring in part) (noting that "a question remains whether [the] analyst's statements were testimonial"); id. at 805–06 (Gorsuch, J., concurring in part) (agreeing with the holding that "when an expert presents another's statements as the 'basis' for his own opinion, he is offering those statements for their truth" but declining to join majority's discussion

about "when an absent analyst's statement might qualify as 'testimonial'" because that "was not part of the question presented for our review").

This Court has likewise misstated the extent of *Smith*'s holding, reading that decision the same way Dawson does. Specifically, in *Watkins v. State*, we described *Smith* as holding that "the trial testimony of an expert witness who restates an absent laboratory analyst's factual assertions in support of his own opinion testimony violates the Confrontation Clause *because the absent lab analyst's factual assertions were offered for the truth of the matter asserted, and were thus testimonial*." 320 Ga. 862, 872–73 (2025) (emphasis added). But this statement conflates the issue of whether evidence was hearsay with the separate issue of whether that same evidence was testimonial. As *Smith* explains, whether a statement is testimonial is a distinct question from whether that statement is offered for the truth of the matter asserted. See 602 US at 800 ("To implicate the Confrontation Clause, a statement must be hearsay ('for the truth') and it must be testimonial—*and those two issues are*

60

*separate from each other*." (emphasis added)). Therefore, we disapprove the incorrect characterization of *Smith*'s holding that appears in *Watkins* and emphasize, consistent with *Smith*, that these inquiries are discrete. Further, we overrule *Watkins* to the extent it holds that a Confrontation Clause violation is proven by showing only that the challenged evidence is hearsay, without also requiring a separate showing that the evidence is testimonial. See *Green v. State*, 318 Ga. 610, 633 (2024) (On questions of federal law, "our Court is bound by holdings of the United States Supreme Court. So if one of our decisions on a question of federal law conflicts with Supreme Court precedent, the high court's precedent controls, and our contrary decision must be overruled.").[15] Applying the controlling decision of *Smith* here, as we must, we conclude that *Smith* does not answer the question of whether the absent pathologist's written statements in the autopsy report at issue were

---

[15] *Watkins* was decided exclusively under federal law. Had our holding in *Watkins* been based on a point of Georgia law, it obviously would control the analysis. See Ga. Const. of 1983, Art. VI, Sec. VI, Par. VI. But our misstatement of the federal rule, as announced by the United States Supreme Court, does not alter that controlling maxim.

61

testimonial. And this is where Dawson's plain-error claim fails.

"[A]n error is plain if it is clear or obvious under current law. An error cannot be plain where there is no controlling authority on point." *Simmons v. State*, 299 Ga. 370, 374 (2016) (cleaned up). And statements in autopsy reports are not obviously necessarily testimonial. Such statements do not clearly fall within the "core class" of testimonial statements specifically identified by the Supreme Court of the United States. See *Crawford*, 541 US at 51-52 (identifying as the "core class" of testimonial statements "ex parte in-court testimony," "extrajudicial statements," and "statements … made under circumstances, which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial"). And the "primary purpose" of such statements is not necessarily "to establish evidence that could be used in a future prosecution." *Munn*, 313 Ga. at 724 (quotation marks omitted). See also OCGA § 45-16-24(a), (b) (identifying circumstances under which "[a] coroner or county medical examiner … shall order a medical examiner's inquiry of that death"). Moreover, Dawson has

not pointed to any controlling authority — whether from the United States Supreme Court or from this Court — holding that statements contained in an autopsy report are testimonial. And we have found no such authority ourselves. In fact, federal and state courts across the country have come down on different sides of the issue, with some courts concluding that statements contained in autopsy reports are indeed testimonial and others rejecting that same proposition. See, e.g., *Hensley v. Roden*, 755 F3d 724, 732–35 (1st Cir. 2014) (discussing in the wake of *Melendez-Diaz* the "unsettled nature" of courts' treatment of autopsy reports in the Confrontation Clause context and collecting cases). Accordingly, whether admission of the substitute pathologist's opinion based on the autopsy report resulted in a Confrontation Clause violation must be considered "subject to reasonable dispute" and, as such, cannot constitute plain error. See *Simmons*, 299 Ga. at 374.

21. Dawson raises four claims of ineffective assistance of trial counsel. As stated above, to prevail on a claim of ineffective assistance, a defendant must demonstrate both that his counsel's

performance was deficient and that he was prejudiced as a result of that deficient performance. See *Strickland*, 466 US at 687.

(a) Dawson's first claim of ineffective assistance challenges counsel's failure to call G.A., Medlock's neighbor, to testify at trial. As we have already discussed with respect to Gines and Mahone, the record offers a reasonable strategic basis for not calling G.A. to testify at trial. And Dawson has not shown that not calling G.A. as a witness was so unreasonable that no competent attorney would have made that decision under the circumstances. See *Jackson*, 306 Ga. at 480. So this claim fails.

(b) Dawson next complains that trial counsel failed to adequately prepare for pre-trial hearings or for the trial itself. Nothing in the record reflects that Dawson, who represented himself during post-conviction proceedings with the assistance of new stand-by counsel, raised this claim in his motion for new trial, however, so this claim is not preserved for appellate review. See *Robinson v. State*, 306 Ga. 614, 616 (2019) ("[T]o avoid a waiver of a claim of ineffective assistance against trial counsel, the claim must be raised

at the earliest practicable moment, and that moment is before appeal if the opportunity to do so is available. … The pre-appeal opportunity is 'available' when the convicted defendant is no longer represented by the attorney who represented him at trial." (cleaned up)).

(c) Pointing to the arrest warrant affidavit that he says was falsified, Dawson asserts that trial counsel performed deficiently by failing to object to the admission of that affidavit at the suppression hearing. But the record shows that counsel did not perform deficiently.

In its order denying the Appellants' motions for new trial, the trial court expressly "credit[ed] the testimony of the prosecutors and the detective, who each denied altering the affidavit" and found that "the affidavit was not falsified or perjured." That finding is supported by the record and, thus, is not clearly erroneous. See *Jordan*, 305 Ga. at 17. As such, an objection to the affidavit on the basis Dawson asserts would have been meritless, and "the failure to make a meritless objection is not deficient performance." *Walker v.*

*State*, 306 Ga. 637, 645 (2019).

(d) Dawson argues that trial counsel was ineffective for failing to request that bench conferences be transcribed or to place the substance of those conferences on the record. In the two-sentence argument he offers in support of this enumeration, Dawson does not suggest what error may have occurred during the bench conferences. He merely asserts without elaboration that "[t]hese omissions deprived [Dawson] of a full and reviewable trial record." Without more, Dawson has failed to meet his burden of proving that he was prejudiced by counsel's failure to ensure that the bench conferences were transcribed. See *Graves v. State*, 306 Ga. 485, 489–90 (2019); *Domingues v. State*, 277 Ga. 373, 374 (2003) (rejecting ineffective assistance claim based on counsel's failure to have voir dire transcribed where defendant did not assert that "anything harmful or prejudicial occurred during voir dire").

(e) Finally, Dawson argues that he was prejudiced by the cumulative effect of trial counsel's deficiencies. But we presumed deficiency on only one claim of ineffective assistance, so there is no

error to consider cumulatively, and this claim fails. See *Lane v. State*, 312 Ga. 619, 625 (2021).

*Judgments affirmed. All the Justices concur.*